THE PEOPLE OF THE STATE OF ILLINOIS, Defendants in Error, *vs.* PETE BARKAS *et al.* Plaintiffs in Error.

*Opinion filed October 26, 1912.*

1. CRIMINAL LAW—*when statement of one defendant is not admissible against others.* If a conspiracy or understanding among the defendants to take the life of a person is established by the evidence the incriminating statements of one are admissible against all, but if no conspiracy or understanding is shown, such statements are admissible only against the defendant making them.

2. SAME—*when proof must show who were present when the incriminating statement was made.* To bind all of the defendants by an incriminating statement of one, upon the theory that it was made in the presence of all, the evidence must show, specifically, who of the defendants were present when the statement was made.

3. SAME—*instruction should not put defendants in a class different from other witnesses.* An instruction in a criminal case may point out the fact that the interest of the defendant is different from that of any other witness and may authorize the jury to take into account the interest of the defendant as affecting his credibility, but it should not put the defendant in a class wholly different from that of other witnesses or disparage his testimony.

4. SAME—*jury not obliged to disregard testimony.* If the jury believe that a witness has knowingly testified falsely as to a material matter they may disregard his uncorroborated testimony, but it is improper for an instruction to advise them that under such circumstances they "should not" believe testimony of such witness.

5. SAME—*the term "reasonable doubt" has no unusual meaning.* The term "reasonable doubt" has no different meaning in the law than in the ordinary transactions of life, and instructions attempting to explain or define the term are ordinarily of little value.

6. SAME—*when officer is not required to have warrant for arrest.* Where some one in an assemblage of persons in a room is guilty of a breach of the peace, a deputy sheriff having knowledge of the act has power and authority to place the offender under arrest, and all those who resist him in the performance of his duty are subject to all the rules applying to persons resisting an officer, even though he has no warrant for their arrest.

7. SAME—*when an instruction to find one defendant not guilty should be given.* If the evidence fails to show any conspiracy or understanding among the several defendants to kill the person who was shot by one of them, an instruction to find a certain one of the defendants not guilty should be given, where the evidence is uncontradicted that he was not present when killing occurred.

WRIT OF ERROR to the Circuit Court of Franklin county; the Hon. W. H. GREEN, Judge, presiding.

HANS WULFF, and W. J. N. MOYERS, for plaintiffs in error.

W. H. STEAD, Attorney General, GEORGE A. HICKMAN, State's Attorney, and FRED .H. HAND, (GEORGE W. PILLOW, of counsel,) for the People.

Mr. JUSTICE COOKE delivered the opinion of the court:

The plaintiffs in error were tried and convicted in the circuit court of Franklin county under an indictment for murder, and were respectively sentenced to serve the following terms in the penitentiary: George Kazakis thirty years, Pete Barkas, John Xerigotis and Louis Lackos each twenty years, and John Kalamaris, Jim Dimos, Christ Pitzounis, Bill Tatsis, Minos Ninos and Angelos Kalamaris each fourteen years. The plaintiffs in error have joined in suing out this writ to review the judgment of the circuit court.

Plaintiffs in error were charged with the murder of Victor Brown, a deputy sheriff, in the village of Ziegler, on April 23, 1911. The Easter Sunday celebrated by the Greek church fell on that day, and plaintiffs in error, to-

gether with other Greeks, were observing the day in Ziegler by a celebration, which began early in the day with a street parade and which terminated at a building known as flat "A." In this building was a room known as No. 90, which was occupied by certain Greeks, and it was there that the celebration was conducted throughout the day. The celebration consisted largely of drinking beer, singing and dancing. Occasionally someone in the room discharged a firearm, evidently of the type known as an automatic, as some of the witnesses testified that seven or eight shots were fired on these occasions in rapid succession, as though they were being fired from a gun of this character. Victor Brown resided in Ziegler and was acquainted with a number of those who were participating in this celebration. Before any trouble occurred it appears that he visited room 90, in flat "A," and drank beer on the invitation of those present. A spirit of good feeling prevailed and it does not appear that there was any enmity existing between Victor Brown and any of those participating in the celebration or that they had had any quarrels or disagreements. After the shooting of firearms first occurred Victor Brown went to room 90, which was situated on the second floor of the building, and arrested George Kolovis, who was pointed out to him as the one who did the shooting. He took him across the street to the office of his brother, Humbert Brown, who was a justice of the peace. Kolovis was fined for disturbing the peace and the fine was paid by a number of Greeks, among them some of the plaintiffs in error, who had accompanied Kolovis to the office of the justice. Victor Brown then requested those taking part in the celebration to desist from shooting, telling them that the authorities would not countenance such a breach of the peace on the Sabbath day. The event was soon repeated, however, and Victor Brown again repaired to room 90, where he placed Pete Barkas under arrest after Barkas had admitted he had done the shooting.

Upon arriving at the office of Humbert Brown, Barkas explained that he had not been guilty of the act himself but offered to plead guilty, saying that he might as well pay the fine as anyone else. Both Victor Brown and his brother explained to Barkas that they did not want to require anyone to pay a fine who had not committed the offense. The evidence of Humbert Brown and Barkas is contradictory as to what then occurred. Humbert Brown testified that Barkas informed his brother, Victor, that the shooting had been done by a new man named John, and that he would point him out if Victor would return with him to room 90. This Barkas denies. He says that he told Victor Brown that the shooting had been done by a new man by the name of George, but that he didn't promise to point him out. Barkas testifies that he did not return to flat "A" with Victor Brown but that he went to flat "C," a building separated from flat "A" by another building known as flat "B," and that he remained in flat "C" until after Victor Brown had been killed. In any event, Victor Brown returned to flat "A" after having discharged Barkas from custody, and returned to the office of his brother with Bill Tatsis, one of the plaintiffs in error. Humbert Brown, aside from being a justice of the peace, was the post-master at Ziegler and also gave instruction in English to a number of the Greeks who were unable to speak the English language, and in this way became acquainted with a great many of them. As soon as Victor Brown appeared with Tatsis, Humbert Brown testifies he told his brother that for some reason Barkas was playing a trick on him, as this was not a new man but one who had been there some time. At the request of Victor Brown, Humbert then accompanied his brother to room 90 in order to ascertain who had done the shooting. The testimony as to what occurred after Victor Brown and Humbert Brown arrived at room 90 is conflicting and very confusing. The number of Greeks who participated in the

celebration varied considerably during the day. Some of the witnesses give the number as being as high as thirty at times. From that the number varied down to fourteen as being the number who were in the room at the time Victor Brown and his brother, Humbert, entered after the arrest of Tatsis. The evidence on the part of the People tends to show that some of the Greeks became enraged at the conduct of Victor Brown in arresting any of their number on their holiday, and that one of these made threats that if Brown attempted to arrest any more of them they would kill him. Upon entering room 90 with his brother, Humbert Brown at his brother's request endeavored to ascertain who had done the shooting. Spiros Kazakis or his brother, George Kazakis, one of the plaintiffs in error, who were both in the room at the time, assumed to take charge of the situation and to give directions to their fellows as to what should be done. They protested that they ought not to be arrested or molested on that day; that if they were guilty of any violation of law they would willingly appear the next day and pay any fine imposed upon them, and that they ought to be left free to celebrate their holiday in such manner as they might see fit. Upon being requested they refused to disclose who had done the shooting. Victor Brown then announced that they were all under arrest, counted the Greeks who were in the room at that time, and, stating there were fourteen of them, drew his revolver and ordered them to accompany him. Spiros Kazakis or George Kazakis then commanded that no one should accompany the officer,—that nobody was to go with him. A Greek, Alex Gusus, was standing beside Victor Brown near the door when Brown flourished his revolver and commanded them all to accompany him. As soon as Brown issued this order Gusus made some statement in the Greek language and immediately thereafter Gusus and Victor Brown clinched, Gusus evidently trying to pinion Victor Brown's arms to his body. The evidence

on the part of the People tends to show that thereupon all the Greeks in the room rushed upon the combatants and in the melee a number of shots were fired and Victor Brown and Gusus were both killed. While this was going on Humbert Brown drew a revolver and discharged it, inflicting a wound upon George Kazakis.

The various accounts given by Humbert Brown and plaintiffs in error of what was said and done from the time Victor and Humbert Brown entered the room are very conflicting. It seems to be generally conceded that Gusus could not speak or understand the English language. The plaintiffs in error testify that when Victor Brown told those in the room that they were under arrest and commanded them to accompany him, at the same time flourishing his revolver, Gusus inquired of his fellows, in Greek, what the officer had said; that before an explanation could be made, Victor Brown, evidently thinking that the remark of Gusus was directed to him and was about to be followed by an assault or resistance to arrest, presented his weapon at Gusus, who immediately grappled with him.

The theory of the State is that Gusus made an assault upon Brown as a part of a preconceived plot to take his life, while the theory of the defense is that Gusus, in his ignorance of the English language, did not comprehend what was said or done and that he simply attempted to grab the arms of Victor Brown to prevent him from inflicting injury upon him. The testimony of Humbert Brown is, that about the time Gusus seized Victor, or simultaneously with the seizure, someone, thought to be George Kazakis, said: "Look at Victor! Grab him! Kill him!" and that thereupon all the Greeks rushed upon him, the firing of shots followed and Victor was killed. According to the testimony of Humbert Brown, his brother was also kicked and beaten, and at the same time an assault was made upon Humbert Brown, and he was knocked down, kicked and beaten and driven from the room. The tes-

timony of those of the plaintiffs in error who admit that they were in the room at the time of the killing is all to the effect that their only intent and purpose, after Victor had pointed his weapon at Gusus and had been seized by him, was either to disarm Victor or to hold him so that he would inflict no injury upon any of their number, and that they had no intent whatever to injure him, much less to take his life.

All of those said to have been in the room at the time of the killing were not apprehended, the plaintiffs in error being the only ones arrested and tried. The revolver of Victor Brown was missing after the killing and has not been found. If the testimony of Humbert Brown is correct as to what occurred during the melee, it is apparent that someone other than Victor Brown and Humbert Brown fired arms, and it is a fair inference from the testimony that Spiros Kazakis, one of those not apprehended, fired a revolver at Victor Brown during the scuffle.

The plaintiffs in error urge as grounds for reversal, first, that the court erred in admitting in evidence statements made by certain of the defendants; second, that four instructions were erroneously given on behalf of the People; and third, that if any crime was committed it was manslaughter and not murder.

The case of the People evidently proceeded upon the theory that there had been a conspiracy on the part of plaintiffs in error and others to take the life of Victor Brown in case he should return to place any more of their number under arrest. Where two or more persons act in concert in the prosecution of a common design, the acts and declarations of any one of them in the accomplishment of the common purpose are the acts and declarations of all and must so be held. (*Barron* v. *People,* 73 Ill. 256; *Samples* v. *People,* 121 id. 547.) If, therefore, it was shown that a conspiracy or understanding existed among plaintiffs in error and others to take the life of Victor

Brown if he should attempt to arrest any others of their number, any declaration made by any one of them that they intended to do so would be competent to be proven as against all of them. In this case no such conspiracy or understanding is shown. The only matters proven that would tend to show that there was such an understanding are .the statements themselves which were permitted to be proven and to which plaintiffs in error objected. It is true that according to the statement of Humbert Brown Victor Brown was killed while an assault was being made upon him by all those in the room at the time, but that might or might not be evidence of a fact that a conspiracy or understanding had existed to do that act. In some instances the court instructed the jury, as the trial progressed and as the testimony was given, that the particular statement was to be taken only as against the defendant who had made it, but in other instances the court allowed the statement to be proven, over the objection of plaintiffs in error, as applying to them generally. The statement particularly objected to along this line is that of George Kazakis, said to have been made to certain of the witnesses for the People and in the presence of other Greeks then in room 90, about a half hour before Victor Brown was killed, to the effect that if he returned and attempted to arrest any more of them "we kill him." This statement was not competent evidence against any of the plaintiffs in error except George Kazakis, unless, as is contended by the People, that statement was made in the presence of all the plaintiffs in error. It is impossible for us to determine who of the plaintiffs in error, if any of them other than George Kazakis, were in the room at the time it is claimed this statement was made. Under such circumstances and in the absence of specific proof as to who of the plaintiffs in error were in the room and heard this statement, it should not have been admitted in evidence against any of them except George Kazakis.

Four of the plaintiffs in error, Pete Barkas, Angelos Kalamaris, John Kalamaris and Minos Ninos, testify that they were not present at the time Victor Brown and Humbert Brown came to room 90 or at the time of the killing and knew nothing of it. Humbert Brown, who claimed to know Pete Barkas well, testified repeatedly that Pete Barkas was not in the room at the time he and his brother arrived there and that he did not see him there during any of the time they were there, and that Pete Barkas did not participate in the assault upon Victor Brown. John Xerigotis, Christ Pitzounis and Bill Tatsis each testified that they submitted to arrest and started to leave the room upon the command of the officer, and that Pitzounis and Tatsis succeeded in passing around Brown and Gusus and through the door and were on the street below when the scuffle occurred and the shots were fired. Xerigotis, who was following, testifies that the struggle between Brown and Gusus at the door prevented him from leaving, but he denies taking any part in the affray. Jim Dimos testified that he left the room with Pitzounis and Tatsis and accompanied them to the street. Louis Lackos testified that he jumped through a window and left the premises as soon as Brown and Gusus grappled and before any shot was fired and that he took no part in the affair. Humbert Brown is the only witness who contradicts any of the plaintiffs in error on these points, and he testified that all the plaintiffs in error, except Pete Barkas, were in the room when he and his brother arrived there and that all of them except Pete Barkas took part in the affray.

At the conclusion of the People's case, and again at the conclusion of all the evidence, peremptory instructions were asked that the plaintiffs in error, respectively, be found not guilty. These were refused.

Plaintiffs in error complain of the following instructions given to the jury on the question of their credibility:

5. "The jury in criminal cases are not required to believe the testimony of the defendant or defendants, and should not do so if the jury, after fairly and impartially considering all the evidence in the case, both that offered for the People and that offered for the defendants, they believe such defendant or defendants has or have willfully and knowingly testified falsely to any matter material to the issues in this case, or that from the facts and circumstances proved on the trial the jury believes, from the evidence, that the testimony of such defendant or defendants is untrue and unreliable, unless corroborated by other credible evidence."

11. "The court instructs the jury that although the law makes the defendants in this case competent witnesses in their own behalf, still the jury are the judges of the weight which ought to be attached to their testimony, and in considering what weight should be given it, the jury should take into consideration all the facts and circumstances surrounding the case as disclosed by the evidence, and give the defendants' testimony only such weight as they believe it entitled to, in view of all the facts and circumstances proved on the trial."

19. "You are instructed that the law gives persons accused of crime the right to testify in their own behalf, but their credibility and the weight to be given to their testimony are matters exclusively for the jury, and in weighing the testimony of the defendants, or such of them as have testified in this case, you have a right to take into consideration the manner of testifying, the reasonableness or unreasonableness of their account of the transaction and interest in the result of the case to them, as affecting their credibility. You are not required to receive blindly the testimony of such accused persons as true, but you are to consider their testimony together with all the other testimony and evidence in the case, and give to it such weight,

and only such weight, as you believe it entitled to in view of all the facts and circumstances proved on the trial."

Each of these instructions was erroneous and should not have been given. While it is true that the interest of the defendant is different from that of any other witness, and it has been held repeatedly by this court that it is proper to point out that fact in an instruction and to direct the jury that they have the right to take into account the interest of the defendant as affecting his credibility, the court cannot go further than that and by instructions either put him in a class wholly different from that of other witnesses or disparage or discredit his testimony. In the fifth instruction the jury were informed that they were not required to believe the testimony of the defendants, and "should not" do so if, after considering all the evidence, they believed that such defendant or defendants had knowingly and willfully testified falsely to any material matter, etc. It is proper to instruct the jury that under such circumstances they may, if they see fit, disregard the testimony of a defendant, but it is a plain invasion of the province of the jury to tell them what they should or should not do under such circumstances. In *Otmer* v. *People,* 76 Ill. 149, we had before us this identical question for consideration. There the court instructed the jury that if they believed the defendant had knowingly sworn falsely in regard to any material point in the case they "ought to" disregard his testimony, etc., and we there held that the instruction was erroneous for the reason that it usurped the province of the jury to say that they ought to disregard the evidence of defendant under certain contingencies. The terms "should" and "ought" are synonymous when used in this sense, and the instruction in the case at bar would mean the same if the word "ought" were substituted for that of "should." It was error to give this instruction. The principal objection urged to the eleventh instruction is, that the use of the word "only" constitutes

a caution to the jury to be careful in giving credit to the defendants' testimony, and that their testimony is thereby discredited. The instruction is inaccurate in this respect and should not have been given in that form. The nineteenth instruction has been expressly disapproved by this court in *People* v. *Arnold,* 248 Ill. 169, and for the reasons there given it was error to give it.

Plaintiffs in error also complain of the ninth instruction given on behalf of the People, which deals with the question of the meaning of the term "reasonable doubt." This is a stock instruction frequently used in criminal trials and has been many times held unobjectionable by this court. While it was not error to give this instruction, it is very questionable whether any good purpose is ever served by giving involved and labored definitions of the words "reasonable doubt" in stating the law to juries in criminal cases. The term "reasonable doubt" has no other or different meaning in law than it has when used in any of the ordinary transactions or affairs of life. It is doubtful whether any better definition of the term can be found than the words themselves.

Plaintiffs in error contend that if they were guilty of any crime at all they were guilty of no greater offense than that of manslaughter. This case was tried on the theory that if the defendants were guilty of any crime they were guilty of murder, and no instructions were offered by them as to the theory of the crime of manslaughter. As we said in *People* v. *Lucas,* 244 Ill. 603: "It was the right of plaintiff in error to submit that question to the jury and require the jury to pass on the question of his guilt or innocence of the crime of murder, and it was not the duty of the court to submit issues and questions to the jury which the parties, by their action, said they did not desire passed upon." It is too late for plaintiffs in error to complain, but as this case must be reversed it is necessary for us to notice one point made in this connection.

Plaintiffs in error seriously contend that Victor Brown had no right, under the circumstances disclosed, to arrest anyone in room 90 without a warrant, and that, not having such right, the plaintiffs in error cannot be held to the rule that those who take the life of an officer in resisting a proper arrest are guilty of murder. The contention that Brown was usurping his authority and had no power to place those in room 90 under arrest is not correct. Some-one there was clearly guilty of the act of disturbing the peace. As a deputy sheriff and a police officer, and knowing that such acts were being committed there, he had the power and authority to place those committing them under arrest, and anyone resisting him while thus in the performance of his duty is subject to all the rules applying to those who resist an officer in the proper discharge of his duty.

After a careful examination of this record we are unable to say with any degree of certainty who was in room 90 at the time of the fatality and who was not there, but as to one of the plaintiffs in error there is no conflict whatever in the testimony. Pete Barkas testifies that he was not present in that room after he had been placed under arrest, taken to the office of Humbert Brown and there released. Humbert Brown, who is well acquainted with Barkas, testifies that Barkas was not present when he accompanied Victor Brown to the room and that he was not present when Victor Brown and Gusus were killed. The only testimony that tends in any way to connect Barkas with the killing is that of Noah Boner, fifteen years old; his brother, Frank Boner, thirteen years old; Fred Walker and John Jeremiah. Noah Boner testified that he did not hear any shots, but he "guessed" that about fifteen minutes after Victor Brown was killed he saw Pete Barkas about ten feet from the steps of flat "A," and that he was running toward the west and from the flat. Frank Boner testified that he was with his brother about four o'clock of that day and that he first saw Pete Barkas coming from the

direction of flat "A" as though he had just stepped off the steps, and that he was running. Fred Walker testified that he saw Barkas running from the direction of flat "A," and that he was about fifty feet from the flat when he first saw him. John Jeremiah testified that shortly after he heard the shots at the time Victor Brown was killed he saw Pete Barkas walking pretty fast about five blocks from flat "A," going toward his home, which was west of flat "A." Barkas himself testified that he heard, within fifteen minutes after the occurrence, that Brown had been killed, and that he immediately left flat "C," where he was, for his home. It appears from the testimony of a number of the witnesses that quite a hue and cry was raised in the village immediately after the killing and threats were made against the lives of the Greek inhabitants. Under the situation that existed there it was not remarkable that Barkas should go to his home as speedily as possible after he learned of the killing of the officer and heard the hue and cry that was being raised. In any event, no matter what his purpose was in running away from the vicinity where Victor Brown was killed, the chief witness for the People, and the one who was the best acquainted with the plaintiffs in error, testified positively that Pete Barkas had nothing to do with the killing, and no one testifies that he was in room 90 at the time. As the People failed to show that there was any conspiracy among the plaintiffs in error to take the life of Victor Brown, the instruction offered at the close of the case to find Barkas not guilty should have been given.

The judgment of the circuit court is reversed as to the plaintiff in error Pete Barkas, and for the errors indicated the judgment of the circuit court as to all the other plaintiffs in error is reversed and the cause is remanded to that court for a new trial. *Reversed in part and remanded.*