# Illinois Official Reports

## Supreme Court

---

### *People v. King*, 2020 IL 123926

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. SHADWICK R. KING, Appellee. |
| Docket No. | 123926 |
| Filed | January 24, 2020 |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Kane County, the Hon. James C. Hallock, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Circuit court judgment reversed. Cause remanded. |
| Counsel on Appeal | Kwame Raoul, Attorney General, of Springfield (Jane Elinor Notz, Solicitor General, and Michael M. Glick and Katherine M. Doersch, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| | Matthew R. Carter, Elizabeth S. Deshaies, and Kate DeBoer, of Winston & Strawn LLP, and Adam R. Vaught, of Hinshaw & Culbertson LLP, both of Chicago, for appellee. |
| | Karl Leonard and Lindsay Hagy, of University of Chicago Law School, of Chicago, for *amici curiae* the Exoneration Project *et al.* |

Justices                  JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Burke and Justices Kilbride, Garman, Karmeier, Theis, and Neville concurred in the judgment and opinion.

## OPINION

¶ 1      Defendant, Shadwick R. King, was charged with the first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) of his wife, Kathleen King. Following a jury trial in the circuit court of Kane County, defendant was convicted and sentenced to 30 years in prison. Defendant appealed, and the appellate court reversed defendant's conviction and remanded for a new trial. 2018 IL App (2d) 151112. We allowed the State's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2018)) and now affirm the appellate court's judgment in part and reverse it in part.

¶ 2                            BACKGROUND

¶ 3      The appellate court's opinion below sets forth a thorough and comprehensive account of the factual history of this case. What follows is an extended summary of that account, sufficient to understand and frame the issues before this court.

¶ 4                        *Kathleen's Death*

¶ 5      Around 6:30 a.m. on July 6, 2014, Kathleen's body was found dead on the railroad tracks approximately 1200 feet from the Geneva home where she lived with defendant and their three sons. Her body had not been there 30 minutes before, when an earlier train came through. A Metra crew member testified that, although he initially believed that Kathleen was still breathing when he first saw her body, he realized as he got closer that she was not breathing and that it had just been her shirt moving in the wind. When found, Kathleen's body was lying on its side, with her head and neck lying on the rail. She was wearing jogging shorts with no underwear underneath; an underwire bra and T-shirt, both of which were pulled up halfway over her breasts; clean running shoes; and ankle socks, one of which was on upside down. She was not wearing her eyeglasses or contact lenses, her earbuds, or her iPhone armband, all of which she normally wore when running. Kathleen's iPhone was found placed against a couple of railroad spikes on the opposite side of the rail from her body. The first officer arrived on the scene at 6:55 a.m. and found no pulse. Although the officer believed that Kathleen had been dead for some time, he called for paramedics because he wanted a medical opinion. When the paramedics arrived, they attached a heart monitor to the body. No heartbeat was detected, but the monitor did detect "pulseless electrical activity," which can carry on for some time after a person dies. The paramedics did not make resuscitation efforts because it appeared that Kathleen had been deceased for quite some time. Emergency medical technician Michael Antenore noted that Kathleen's skin was a "cyanotic purple" color and that her pupils were "fixed and dilated." Antenore also noted that the paramedics had mud on their shoes, due to an overnight rain, but that Kathleen's running shoes were clean. It was later determined that, at the time of her death, Kathleen's blood alcohol content was 0.15.

¶ 6        On the evening prior to Kathleen's death, she and defendant and their three sons attended a Fourth of July party at the Elk Grove Village home of Kathleen's father, Kurt Kuester. Kathleen and defendant consumed several drinks at the party. They left the party together at 10:45 p.m., while the children remained with Kurt for an overnight stay. Kathleen did not appear to have any bruises or injuries when she left the party. After leaving the party, Kathleen and defendant went to a bar in Geneva, where they both consumed several more drinks. They left the bar around 2 a.m. and headed home. A man who was at the bar and who knew the Kings testified that he did not see any bruises or injuries on Kathleen that night.

¶ 7        According to defendant, shortly after they arrived home, Kathleen began receiving text messages from Billy Keogh, a man she had met earlier that year at Army Reserve training in Texas and with whom she had since spent time and been in regular and often intimate contact. Defendant and Kathleen had argued about Keogh in the past, and they had discussed the possibility of divorce because of Kathleen's relationship with him. Around 4 a.m., defendant sent several text messages to Keogh from Kathleen's phone. These messages purported to be from Kathleen, telling Keogh that she and defendant were presently having sex. Around 4:45 a.m., defendant left the house and drove to Chase Bank, where he withdrew $500 in "pocket money" from the ATM for some car repairs that he needed. According to defendant, shortly after he returned home from the bank, Kathleen changed her clothes and went out for a run. Defendant then slept for about 30 minutes, after which he left the house to get gas, "drive round," and buy donuts. He then left to pick up his children from Kurt's house.

¶ 8        Around 10:15 a.m. on July 6, Kathleen's sister, Kristine Kuester, called Kathleen's phone. A Geneva police officer answered and told Kristine that Kathleen was dead. Kristine immediately called Kurt with the news. While Kristine was talking to Kurt, defendant showed up to pick up his boys. Kurt testified that this was surprising because defendant "never" picked up the boys. Kurt immediately asked defendant where Kathleen was, and defendant replied that they had had a fight and that Kathleen had gone out for a run to clear her head. Kurt told defendant that Kathleen was dead, to which defendant replied, "I didn't do anything. I didn't do anything." According to Kurt, during the entire time he was at Kurt's house that morning, defendant never asked what had happened to Kathleen or where she was.

¶ 9        Two Elk Grove Village police officers transported defendant from Kurt's house to the Geneva police station for an interview. According to the officers, it was 20 minutes into the ride before defendant asked what had happened to Kathleen. Over the course of two interviews with the Geneva police, defendant consistently denied any involvement in Kathleen's death.

¶ 10                                              *Pretrial Motions*

¶ 11        Following a preliminary hearing, defendant's case was assigned to Judge James C. Hallock. Prior to trial, and pursuant to 18 U.S.C. § 2703(d) (2012), the State filed a motion seeking access to cell tower registration records for defendant's and Kathleen's cell phones for the 24 hours surrounding Kathleen's death. In response, defendant made an oral motion to declare section 2703(d) unconstitutional under the fourth amendment to the United States Constitution. U.S. Const., amend. IV. On July 17, 2014, Judge Hallock granted the State's motion seeking access to the cell tower records and denied defendant's motion to declare section 2703(d) unconstitutional. The next day, defendant moved for a substitution of judge as a matter of right, pursuant to section 114-5(a) of the Criminal Procedure of 1963 (725 ILCS 5/114-5 (West

2014). In a written order, another judge denied that motion after concluding that Judge Hallock made a substantive ruling when he denied defendant's oral motion to declare section 2703(d) unconstitutional.

¶ 12    The State also filed a pretrial motion *in limine* seeking leave to call Mark Safarik as an expert witness on "crime scene analysis." The motion stated that Safarik was a "crime scene and behavioral analyst" for a private consulting firm and that Safarik had 23 years' prior experience with the Federal Bureau of Investigation (FBI), including as a supervisor with the behavioral analysis unit. The substance of Safarik's proposed testimony was contained in a written report that was submitted separately to the trial court but is not in the record. The court granted the State's motion over defendant's objection. In so ruling, the court explained that Safarik's "specialized knowledge" was "reliable" and "relevant" and that the general subject matter of his testimony would assist the jury to understand the evidence and to determine the facts. Nevertheless, and assuming that the State succeeded in qualifying Safarik as an expert at trial, Safarik's opinions would have to be rendered "pursuant to his qualifications," and he would not be permitted to identify defendant as the killer by direct testimony. The court also ruled that Safarik would not be allowed to give profiling testimony.

¶ 13                                    *Expert Testimony*

¶ 14    The State called forensic pathologist Dr. Mitra Kalelkar, who performed Kathleen's autopsy. Dr. Kalelkar noted the clothing on the body, as described above. Dr. Kalelkar also noted the presence of antemortem (before death), postmortem (after death), and perimortem (at the time of death) abrasions and bruises, some of which were inconsistent with Kathleen having fallen or collapsed on the tracks. Specifically, she testified that an antemortem bruise under the chin was consistent with someone's hands having been around Kathleen's neck or Kathleen having tried to pry someone's hands off her neck. Dr. Kalelkar opined that an antemortem bruise on the upper left arm was consistent with someone grabbing her. In her initial autopsy report, Dr. Kalelkar listed the cause of death as "asphyxiation," and she did not classify it as a homicide. In her trial testimony, however, she stated that the cause of death was "manual strangulation" and that she based that conclusion on certain hemorrhages that she found in Kathleen's eyes, throat, and tongue.

¶ 15    The State next called Mark Safarik, the expert witness on "crime scene analysis." Safarik testified that, as director of a consulting company named Forensic Behavioral Services International, he conducts "analyses and interpretations" of complex violent crime scenes and violent crimes to "understand essentially what happened in the crime, how it happened[,] and why the events unfolded the way that they did." Safarik testified that he also conducts "equivocal death evaluations" in cases where the "manner of death is not well established." According to Safarik, the Kane County State's Attorney's Office asked him to examine the evidence from the scene where Kathleen's body was found to determine (1) whether the scene was staged, (2) the offender's risk level, (3) a general offender motive, and (4) the "behavioral manifestations at the scene," meaning the offender's *modus operandi*, ritual behavior, and staging behavior. Safarik's background includes no training, certification, or experience in either medicine or pathology.

¶ 16    Safarik testified that he typically reviews crime reports, criminal investigation reports, crime scene photographs, autopsy protocols, autopsy photographs, diagrams and sketches of

the crime scene, and witness statements. He also reviews any toxicology reports. If he needs the information, Safarik will ask to see the statements of witnesses who talked to the police about the victim's habits. Safarik testified that he will also consider, as he did here, an accused's statements, if they contribute to an understanding of the timeline of events leading up to a murder. Safarik also considered statements from the Kings' oldest son as to where Kathleen usually ran, as well as the app on her iPhone that recorded where she ran. According to the app, Kathleen usually ran in Esping Park but not near the railroad tracks.

¶ 17   From his review of the case, Safarik drew the following "expert" conclusions: (1) Kathleen did not usually run on the railroad tracks; (2) defendant's statement to police that Kathleen left the house to go running at 6:30 a.m. was inconsistent with the lividity present on her body less than half an hour later, when the death scene photographs were taken, which indicated that she died prior to 6:30 a.m.; (3) the lividity on Kathleen's right leg was inconsistent with her position on the railroad tracks; (4) if she had been running, her shorts would have been tied and not loose; (5) the absence of an undergarment or a liner in Kathleen's running shorts was inconsistent with her being out for a run; (6) because Kathleen had "fairly large" breasts, running in an underwire bra would have been painful; (7) Kathleen had a large selection of sports bras, so she would not have been running in an underwire bra; (8) the presence of the underwire bra was inconsistent with defendant's statement that Kathleen possessed running gear; (9) Kathleen's twisted bra strap would have been "very uncomfortable" and was inconsistent with the way she would have put on the bra; (10) there was no sexual motive to the crime, because Kathleen's bra was covering half her breasts; (11) it was unlikely that Kathleen would have put on her left sock with the heel twisted toward the top of her foot; (12) a clump of hair in her right sock was inconsistent with the way a person would dress herself; (13) Kathleen was not wearing an armband, which was inconsistent with witnesses' statements that she wore one when running; (14) the absence of earbuds was inconsistent with witnesses' statements that Kathleen listened to music while running; (15) the leaf material on Kathleen's body was inconsistent with that in the area where the body was found; (16) Kathleen's iPhone was placed on the tracks by someone; (17) a trail of dried saliva mixed with blood running down Kathleen's cheek was inconsistent with the way her head was positioned on the tracks, indicating that she was on the tracks after the saliva had dried; (18) Kathleen was moved onto the tracks after she died in a different location; (19) Kathleen died as a result of manual strangulation; (20) a red mark on Kathleen's neck was consistent with hands having been around her neck; (21) a bruise under Kathleen's chin was consistent with someone having strangled her; (22) every form of asphyxiation except manual strangulation was ruled out; (23) Kathleen's injuries were inconsistent with a fall on the tracks; (24) scrapes on Kathleen's shins were postmortem because there was no blood; (25) Kathleen was incapacitated by alcohol and did not see the attack coming; (26) the attack came on very quickly; (27) strangers do not stage crime scenes; (28) a staged crime scene indicates that the killer was someone close to the victim; (29) the offender attempted to make Kathleen's death look like an accident; (30) the leaf material found on Kathleen's body was from her residence; and (31) based on the timeline that defendant gave to the police, Kathleen was killed in her residence.

¶ 18   Following the denial of his motion for a directed verdict, defendant called Dr. Larry Blum, a forensic pathologist, who testified that Kathleen died of a cardiac event brought on by stress, alcohol intoxication, lack of sleep, and caffeine consumption. Dr. Blum opined that Kathleen

was running on the railroad tracks, became unwell, sat down on the rail, and died. According to Dr. Blum, he was able to identify only one of the six common indicators of asphyxia and was unable to identify any injuries on either defendant or Kathleen that were consistent with manual strangulation. Dr. Blum acknowledged Dr. Kalelkar's findings of hemorrhages in the eyes and at the base of the tongue, but he opined that those findings, standing alone, did not support a conclusion that Kathleen was manually strangled. Dr. Blum also testified that Dr. Kalelkar's autopsy report was incomplete because "asphyxiation" as a cause of death was nonspecific.

¶ 19 In rebuttal, Dr. Kalelkar testified that her autopsy findings led her to conclude that Kathleen died of asphyxiation due to pressure applied to her neck. She also testified that Dr. Blum's diagnosis of a cardiac event ignored evidence of strangulation.

¶ 20 *Kristine's and Kurt's Testimony*

¶ 21 Over defendant's objection, Kristine was allowed to testify that Kathleen was Kristine's "best friend" and had played a "motherly role" toward Kristine since Kristine was in high school. Kristine also testified that Kathleen had helped to pick out Kristine's wedding dress.

¶ 22 Also over defendant's objection, both Kristine and Kurt were allowed to testify about their reactions to hearing the news of Kathleen's death. On this point, Kristine testified that she "didn't know what to do," "was walking back and forth in my apartment," and had "burst into tears" and "was shaking and just crying nonstop." Kristine also testified that, when she called Kurt to tell him that Kathleen was dead," Kurt was "frantic, and he didn't believe me. He just kept asking me what I was saying." In that same telephone call, Kristine told Kurt to "call the police" because the boys were at Kurt's house and Kristine "didn't want the defendant to pick up the boys." Kristine then drove over to Kurt's house, where she found Kurt "crying" and "shaking." For his part, Kurt testified that, when he received the telephone call from Kristine informing him of Kathleen's death, he was "frantic" and "started screaming on the phone, 'What are you talking about? What are you—where?' "

¶ 23 *Closing Argument and Verdict*

¶ 24 During the prosecution's rebuttal closing argument, the prosecutor made the following statements to the jury, without any objection from defendant:

"One of the things that you need to understand here is that it is the burden upon the People of the State of Illinois to prove to you beyond a reasonable doubt that the defendant is guilty of first degree murder.

It is the burden that is put upon us. What you need to understand is that it's okay for you to go back there to the jury deliberation room and have questions. It's okay for you to go back to the jury deliberation room and have questions and still convict the defendant.

It's okay for you to have questions such as what point of access did he take. It's okay for you to have a question like that and to convict the defendant. As long as those questions don't amount to a reasonable doubt. If you take a look at all the other evidence in this case, it is clear that this is beyond a reasonable doubt."

The jury found defendant guilty of first degree murder, and the trial court sentenced him to 30 years' incarceration.

¶ 25                                    *Appeal*

¶ 26        Defendant filed a timely notice of appeal, and the appellate court reversed defendant's conviction and remanded for a new trial. 2018 IL App (2d) 151112. The appellate court's decision began by holding both that defendant's motion for substitution of judge was properly denied (*id.* ¶ 60) and that the evidence was sufficient to support a finding of guilt beyond a reasonable doubt, such that retrial will not violate double jeopardy principles (*id.* ¶ 66). From there, the appellate court reached its primary holding, which was that Safarik's testimony was inadmissible in its entirety because the opinions he rendered were either beyond his qualification or involved conclusions that the jurors easily could draw for themselves without any expert assistance. According to the appellate court, this alone warranted a new trial because "the evidence of guilt in the present case was not overwhelming" and it was therefore "prejudicial error to grant the State's motion *in limine* *** and to permit the testimony at defendant's trial." *Id.* ¶ 89. In addition, the appellate court concluded that portions of Kristine's and Kurt's testimony were unduly inflammatory and therefore inadmissible on retrial (*id.* ¶ 91) and that the State's comments in closing argument about the reasonable doubt standard were improper and should not be repeated (*id.* ¶ 92).

¶ 27        The State appealed to this court, and we allowed its petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Nov. 1, 2017)).

¶ 28                                   DISCUSSION
¶ 29                              *Substitution of Judge*

¶ 30        We first consider defendant's argument, raised by way of cross-appeal, that the trial court erred in denying his motion for substitution of judge as of right. That motion was filed pursuant to section 114-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-5 (West 2014)), which provides a defendant with the "absolute right" to a substitution of judge upon the timely filing of a proper written motion for substitution. *People v. Walker*, 119 Ill. 2d 465, 470 (1988). Pursuant to the statute, a defendant must be granted an automatic substitution of judge if the defendant meets the following requirements: (1) the motion is made within 10 days after defendant's case is placed on the judge's trial call; (2) the motion names only one judge unless the defendant is charged with a Class X felony, in which case he may name two judges; (3) the motion is in writing; and (4) the motion alleges the trial judge is so prejudiced against the defendant that the defendant cannot receive a fair trial. *People v. McDuffee*, 187 Ill. 2d 481, 488-87 (1999). In addition, this court has held that the motion must be made before the trial judge makes "a substantive ruling" in the case. *Id.* at 488.

¶ 31        Here, no one disputes that defendant filed his motion within the 10-day statutory time limit. The question is whether that motion was filed before Judge Hallock made a substantive ruling in this case. We hold that it was not. The record shows that, on the day before defendant filed his motion, Judge Hallock granted the State's motion for access to cell tower registration records for defendant's and Kathleen's cell phones. To prevail on this motion, the State was required to provide "specific and articulable facts" showing that there are "reasonable grounds" to believe that the contents of the records sought are "relevant and material to an ongoing

criminal investigation." 18 U.S.C. § 2703(d) (2012). In support of its motion, the State asked Judge Hallock to consider the following facts when deciding whether to grant the requested relief, which the State sought for the purpose of "more precisely pinpoint[ing] the location of the cell phones" during the 24 hours surrounding Kathleen's murder: (1) defendant was charged with the first degree murder of his wife, Kathleen; (2) the judge at defendant's bond hearing found probable cause to believe that defendant had committed the charged offense; (3) defendant admitted to police that he had taken Kathleen's phone from her at about 4 a.m. on July 6, following an argument; (4) Kathleen's cell phone was found near her body; (5) Kathleen's body had been moved to the tracks after she was murdered somewhere else; (6) cadaver dogs had alerted to the presence of human decomposition on the backseat of defendant's car; and (7) defendant was at all relevant times in possession of his own phone. Given all of this, it goes without saying that, in ruling on the State's motion, Judge Hallock was required to assess the preliminary merits of the State's case against defendant. Moreover, the motion itself went to the State's ability to obtain specific and substantive evidence for use in its prosecution of defendant for first degree murder. This was not mere procedure. On the contrary, the State's motion clearly sought substantive relief in the form of access to otherwise protected evidence, and a substantive ruling is exactly what Judge Hallock provided when he granted that motion. *C.f. People v. Taylor*, 101 Ill. 2d 508, 518 (1984) (ruling on a motion to limit the State's use of other-crimes evidence was a substantive ruling that rendered subsequent substitution motion untimely). Coming as it did after this ruling, defendant's motion for substitution of judge as of right was clearly untimely, and we therefore hold that it was properly denied.

¶ 32                                    *Safarik's Testimony*

¶ 33        We next consider the State's argument that the appellate court erred in holding that Mark Safarik's testimony was inadmissible in its entirety and that the trial court's failure to exclude it mandates a new trial in this case.

¶ 34        As noted above, the State filed a pretrial motion *in limine* seeking leave to call Safarik as an expert witness in the field of "crime scene analysis." In addition to granting that motion and allowing Safarik to testify, the trial court overruled numerous contemporaneous objections that defense counsel made during the course of Safarik's trial testimony. Generally speaking, defense counsel's objections asserted that the opinions Safarik was rendering were either beyond his qualification to render or involved conclusions that the jurors easily could draw for themselves without any expert assistance.

¶ 35        "In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288 (1990). In addressing the admission of expert testimony, the trial court should balance the probative value of the evidence against its prejudicial effect to determine the reliability of the testimony. *Id.* at 290. In addition, in the exercise of its discretion, the trial court should carefully consider the necessity and relevance of the expert testimony in light of the particular facts of the case before admitting that testimony for the jury's consideration. *Id.* This court has held that expert testimony is necessary only when "the subject is both particularly within the witness' experience and qualifications and beyond that of the average

juror's, and when it will aid the jury in reaching its conclusion." *People v. Cloutier*, 156 Ill. 2d 483, 501 (1993). Expert testimony addressing matters of common knowledge is not admissible "unless the subject is difficult to understand and explain." *People v. Becker*, 239 Ill. 2d 215, 235 (2010). When determining the reliability of an expert witness, a trial court is given broad discretion. *Enis*, 139 Ill. 2d at 290. Therefore, we review the trial court's decision to admit evidence, including expert witness testimony, for an abuse of that discretion. *Becker*, 239 Ill. 2d at 234. An abuse of discretion occurs only where the trial court's decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 36    Here, there is absolutely no question that Safarik never should have been allowed to testify as an expert in this case. To begin with, significant portions of Safarik's testimony went far beyond the field of "crime scene analysis," which is Safarik's undeniable field of expertise. Indeed, Safarik began his testimony by confirming that he had been hired by the Kane County State's Attorney's Office to "conduct a crime scene analysis." More specifically, Safarik explained, he had been asked to render expert opinions on whether the crime scene had been staged, the offender's risk level, the offender's motive, and "the behavioral manifestations at the scene." To qualify Safarik as an expert in this area, the State walked Safarik through his experience and qualifications, which includes 8 years in local law enforcement and 23 years with the FBI, including 12 years as a supervisory special agent in the FBI's behavioral analysis unit. Safarik also testified that he has published, taught, and lectured extensively in the field of "crime scene analysis." Following this testimony, the State tendered Safarik as "an expert in crime scene analysis," and the trial court accepted that tender after finding Safarik "a qualified expert to testify within the area of crime scene analysis." The problem is that, after laying this foundation, the State then elicited opinions from Safarik on such matters as the cause and manner of Kathleen's death, whether the lividity on Kathleen's body was consistent with her positioning on the railroad tracks, whether certain injuries and abrasions found on Kathleen's body were sustained before or after her death, whether Kathleen's injuries were consistent with her having fallen on the tracks, and whether leaves found on Kathleen's body were consistent with leaves found in and around the Kings' home.[1] Not one of these matters falls within the scope of "crime scene analysis," which Safarik himself defines as:

> "a very detailed study of the dynamic interaction between the offender or offenders and the victim or victims and the interaction with the scene to understand what is really going on here, what happened in this crime, how did things happen both in a chronological order and in a temporal or time order and then to provide some level of interpretation of that analysis *to understand why the events occurred*." (Emphasis added.)

---

[1]Safarik's testimony about the leaf fragments was especially egregious. Safarik testified that, in his expert opinion, Kathleen was killed at home and part of the basis for this opinion was his observation that the leaves found on her body were "consistent with" leaves found in and around her home. Safarik was permitted to render this opinion, not only in the absence of any training or experience in botany, but also despite a March 10, 2015, stipulation from the parties stating that the Geneva Police Department had submitted leaf samples to laboratories at both the University of Illinois at Chicago and the Morton Arboretum and that neither laboratory could determine whether the leaves found on Kathleen's body came from the Kings' property.

As importantly, there is nothing in Safarik's experience, background, or training that suggests any specialized knowledge of these matters sufficient to qualify him as an expert. Safarik is undoubtedly an expert in criminal investigation and crime scene analysis. But that is hardly the same thing as being an expert in forensic pathology or botany, both of which are scientific fields into which Safarik's testimony repeatedly transgressed. Safarik never should have been allowed to testify to these matters, and the trial court's failure to exclude such testimony was undeniably error.

¶ 37 That being said, we wish to stress that expert medical testimony is not always required to prove a decedent's cause of death. On the contrary, in a case involving a man who died after sustaining a pistol shot to the abdomen, this court held expressly that expert medical testimony was not required to prove that the gunshot wound was in fact mortal. *Waller v. People*, 209 Ill. 284, 287-88 (1904). In so doing, this court explained that, "[w]here the facts proved are such that every person of average intelligence would know, from his own knowledge or experience, that a wound was mortal," expert cause-of-death testimony is unnecessary. *Id.* at 288. That is not what happened here. On the contrary, what happened here is that the jury was presented with a decedent whose cause of death was not only not obvious but in fact hotly contested by two competing and highly qualified medical experts, one saying it was a homicide caused by manual strangulation and the other saying it was a natural death caused by a sudden cardiac arrhythmia. Safarik was in no position to jump into this fray and, despite a complete lack of any medical training or experience, render expert opinions on such matters as the process and timing of lividity onset, the presence and causes of petechial hemorrhaging, and the presence or absence of the primary indicators of four distinct categories of asphyxia. Unlike *Waller*, this is not a case where "the facts proved are such that every person of average intelligence would know, from his own knowledge or experience, that a wound was mortal." On the contrary, this case is *Waller*'s polar opposite, where Kathleen's cause of death could be established *only* by expert medical testimony. Nothing about Safarik's background, experience, or training qualified him to do this, and consequently the trial court never should have permitted him to testify on these matters.

¶ 38 As for the balance of Safarik's testimony, while it undoubtedly fell within his experience and qualifications, it also fell well within the ken of an average juror and therefore did not necessitate expert assistance. This court has explained that an expert's testimony will assist the jury when his or her testimony offers "knowledge and application of principles beyond the ken of the average juror," and that evidence is beyond the ken of the average juror when "the evidence involves knowledge or experience that a juror generally lacks." *People v. Mertz*, 218 Ill. 2d 1, 72 (2005). Here, Safarik testified to numerous conclusions that ordinary jurors easily could draw for themselves, including that an experienced runner would not have dressed in the garments Kathleen was wearing when she died; that Kathleen would not have left her contacts, earbuds, and armband at home when she went running; that Kathleen would not have been running on the railroad tracks when her habit was to run in the park; that Kathleen would not have put on a sock with the heel twisted to the top of her foot; that Kathleen's iPhone had been placed on the railroad tracks by someone other than Kathleen; and that Kathleen likely died somewhere else and was later moved to the tracks. The same holds true for Safarik's alleged "profiling" testimony. Even without specialized training in crime scene analysis or human behavioral psychology, an ordinary juror is fully capable of understanding and concluding that, given the condition of the body and nature of the scene, there was no sexual motivation

involved in Kathleen's murder; that Kathleen was surprised by her attacker; that the crime scene was staged; and that generally speaking, strangers have no reason to stage a crime scene. Indeed, faced with precisely this type of testimony from Safarik in another case, a New Jersey appellate court deemed it entirely inadmissible on the grounds that "Safarik was not testifying as to a subject matter peculiarly within his expertise or knowledge and unrecognizable or unfamiliar to the layperson" but instead "was simply testifying about logical conclusions the ordinary juror could draw from human behavior" "without the need for expert guidance by one knowledgeable of, or experienced in, behavioral assessment." *State v. Lenin*, 967 A.2d 915, 926-27 (N.J. Super. Ct. App. Div. 2009). We agree wholeheartedly with this assessment and likewise conclude that Safarik's testimony was inadmissible in its entirety.

¶ 39        In reaching this conclusion, we wish to stress that we will not condone the calling of experts solely for the purpose of shoring up one party's theory of the case, which is precisely the role that Safarik played here. In January 2015, at the hearing on the State's motion *in limine*, defense counsel argued that the State's desire to call Safarik "is nothing more than [an] attempt to turn their closing argument into expert testimony and that is not the proper use of an expert." Not surprisingly, the State strongly disagreed with this assertion. Yet at oral argument before this court, the State affirmed that Safarik is "an expert in drawing inferences from crime scenes" and that his testimony was necessary because he draws such inferences better than jurors and attorneys do. Drawing inferences from crime scenes is the *sine qua non* of closing argument, just as it is the essential function of juries in criminal cases. In presenting Safarik for that express purpose, the State was effectively calling a thirteenth juror to the stand to lend his expert imprimatur to the State's characterization of the evidence. That is a wholly improper use of expert testimony, and we want to make absolutely clear that such testimony is not to be permitted going forward.

¶ 40        The only remaining question on this point is whether the trial court's erroneous admission of Safarik's testimony was harmless. We hold that it was not. This court has recognized three approaches to determine whether an error such as this is harmless beyond a reasonable doubt: (1) whether the error contributed to the defendant's conviction, (2) whether the other evidence in the case overwhelmingly supported the defendant's conviction, and (3) whether the challenged evidence was duplicative or cumulative. *People v. Lerma*, 2016 IL 118496, ¶ 33. In this case, each of these approaches establishes that the trial court's decision allowing Safarik's testimony was not harmless beyond a reasonable doubt. First, we cannot say that Safarik's improper testimony did not contribute to defendant's conviction. As the appellate court below correctly noted, to the extent that Safarik was permitted to render medical opinions that were far beyond his qualifications and experience, he "broke the tie" between two qualified medical experts who strongly disagreed not only on the cause of Kathleen's death but also on whether that death was even a homicide. 2018 IL App (2d) 151112, ¶ 79. Likewise, to the extent that Safarik was permitted simply to draw commonsense inferences from the crime scene evidence, he gave "expert" credence to the State's theory of the case, such that, in order to acquit, the jury would have to overcome the fact that an "expert" effectively had endorsed the State's entire closing argument. Second, this was not a case in which the evidence of guilt was overwhelming. On the contrary, in addition to the strongly opposing opinions expressed by the qualified medical experts, the State's evidence in this case included no confession, no eyewitnesses, and no forensic evidence connecting defendant to the crime. Third, Safarik's testimony was not duplicative or cumulative. Safarik was the only witness to testify that the

leaves found on Kathleen's body were consistent with leaves found in and around the Kings' home and that Kathleen therefore must have been killed at home. Moreover, Safarik was the only witness to give "expert" credence to dozens of common-sense inferences that support the State's theory of the case. Given all of this, we simply cannot say that the admission of Safarik's testimony was harmless.

¶ 41                              *Kristine's and Kurt's Testimony*

¶ 42    The State next argues that the appellate court erred in concluding that certain portions of Kristine's and Kurt's testimony were unduly prejudicial and therefore should have been excluded. At issue is Kristine's testimony that Kathleen was like a mother to her and had helped Kristine purchase her wedding dress, as well as both Kristine's and Kurt's descriptions of how they reacted upon hearing the news of Kathleen's death.

¶ 43    This court has held consistently that a defendant's guilt must be established by legal and competent evidence, uninfluenced by bias or prejudice raised by irrelevant evidence. *People v. Bernette*, 30 Ill. 2d 359, 371 (1964). Accordingly, where evidence that the deceased has left behind a family "is presented in such a manner as to cause the jury to believe it is material," its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence. *Id.*; see also *People v. Harris*, 225 Ill. 2d 1, 31 (2007). That said, this court also has emphasized that "incidental evidence of a victim's family is not only permissible, but in most trials, unavoidable, since '[c]ommon sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members.' " *People v. Blue*, 189 Ill. 2d 99, 131 (2000) (quoting *People v. Free*, 94 Ill. 2d 378, 415 (1983)). In other words, "a distinction exists between making the jury aware of the family left behind and cases where the prosecution has dwelt upon the deceased's family to the point that the jury would have related that evidence to the defendant's guilt." *People v. Kitchen*, 159 Ill. 2d 1, 33 (1994). Given this, this court has refused to find error where evidence of the victim's family is "isolated and sporadic," is "incidental to other relevant evidence adduced at trial," is "not presented in an inflammatory manner," does "not lead jurors to believe it is material," or merely involves "introductory, foundational questions pertaining to the witness' background." *People v. Pasch*, 152 Ill. 2d 133, 199 (1992).

¶ 44    Here, the appellate court concluded that all of the challenged evidence fell within the scope of *Bernette*'s prohibition. We disagree. Kristine's testimony that Kathleen was like a mother to her and had helped Kristine purchase her wedding dress is not the type of testimony contemplated by *Bernette*. To begin with, Kristine's testimony comprises over 80 pages in the report of proceedings, and the challenged comments about her relationship with Kathleen are contained in two brief responses to two questions posed by the State during the first few minutes that Kristine was on the stand. The closeness of Kristine's relationship with Kathleen was not a subject matter on which the State lingered or dwelt, and nothing about the form of or responses to the State's questions on this point would lead jurors to believe that this testimony was in any way material to the question of defendant's guilt or innocence. On the contrary, Kristine was the State's principal witness to Kathleen's patterns and habits, and the State specifically informed the trial court that it was asking these questions to lay a foundation for Kristine's knowledge of those patterns and habits. These two questions came at the very beginning of the State's questioning of Kristine, and they were followed immediately by a long

- 12 -

series of questions relating to Kathleen's patterns and habits, as observed firsthand by Kristine. In other words, these were exactly the kind of "introductory, foundational questions pertaining to the witness' background" of which this court specifically approved in *Pasch*, and nothing about the State's framing of those questions or Kristine's responses to them suggests otherwise.

¶ 45 The same cannot be said, however, about the testimony concerning how Kristine and Kurt responded upon hearing the news that Kristine was dead. Unlike the questions about the closeness of Kristine's relationship with Kathleen, which came at the start of Kristine's testimony and were clearly designed to lay a foundation for that testimony, the questions about how Kristine and Kurt reacted to the news of Kathleen's death were among the very last questions that the State asked of these witnesses. In other words, these questions formed the climax of the State's examination of both of these witnesses, and the State clearly intended for their understandably emotional responses to make a strong and lasting impression on the jury. As importantly, how Kristine and Kurt reacted upon hearing the news of Kathleen's death is of no probative value whatsoever on the question of defendant's guilt or innocence, while at the same time being highly and inherently prejudicial against defendant.[2] In fact, this court has held that "the irrelevancy and highly prejudicial nature of such evidence is so well established, that it [is] the duty of the court in a murder case to [refuse] it on its own motion," even absent a contemporaneous objection. *Bernette*, 30 Ill. 2d at 372. Here, the trial court not only allowed the testimony, it did so *over* defendant's contemporaneous objection. This was clearly error, and we therefore agree entirely with the appellate court's conclusion below that all such testimony is wholly inadmissible on retrial.

¶ 46                                *Closing Argument*

¶ 47 We next consider the State's argument that the appellate court erred in concluding that the State improperly attempted to define and dilute the reasonable doubt standard in its closing argument and that similar comments must be avoided on remand.

¶ 48 Illinois is among the jurisdictions that do not define reasonable doubt, and this court has long and consistently held that neither the court nor counsel should define reasonable doubt for the jury. *People v. Downs*, 2015 IL 117934, ¶ 19; *People v. Speight*, 153 Ill. 2d 365, 374 (1992); *People v. Cagle*, 41 Ill. 2d 528, 536 (1969); *People v. Malmenato*, 14 Ill. 2d 52, 61 (1958); *People v. Moses*, 288 Ill. 281, 285 (1919). The rationale behind this rule is that "reasonable doubt" is self-defining and needs no further definition. *Cagle*, 41 Ill. 2d at 536. Or to put it another way, "[t]he term 'reasonable doubt' has no other or different meaning in law than it has when used in any of the ordinary transactions or affairs of life," and therefore "[i]t is doubtful whether any better definition of the term can be found than the words themselves." *People v. Barkas*, 255 Ill. 516, 527 (1912). Accordingly, in *Speight*, this court held that it was error for the prosecutor to say to the jury, " 'Reasonable doubt, well what does reasonable doubt mean? *It means a doubt that has to be substantial*, ladies and gentleman.' " (Emphasis in original.) *Speight*, 153 Ill. 2d at 374. Similarly, in *Cagle*, this court held that it was error for

---

[2]The State asserts that this evidence was "relevant to show that, by contrast, defendant's reaction to the news of [Kathleen's] death *** [was] unusual and supported a consciousness of guilt." The State does not develop this argument beyond its mere assertion, and we are unaware of any authority for the proposition that surviving family's reaction to news of the victim's death is probative evidence of the accused's mental state.

the trial court to instruct the jury that a "reasonable doubt" is one " 'that, were the same kind of doubt interposed in the graver transactions of life it would cause a reasonable and prudent man to hesitate and pause.' " *Cagle*, 41 Ill. 2d at 536.

¶ 49 The problem in cases like *Speight* and *Cagle* is that the jury was being given a definition for the term "reasonable doubt" itself. Nothing like that happened here. In fact, the State went out of its way *not* to define that term and instead left it to the jury to ascertain its meaning. Again, what happened here is that the State told the jury:

> "It's okay for you to go back there to the jury deliberation room and have questions. It's okay for you to go back to the jury deliberation room and have questions and still convict the defendant.
>
> It's okay for you to have questions such as what point of access did he take. It's okay for you to have a question like that and to convict the defendant. *As long as those questions don't amount to a reasonable doubt*." (Emphasis added.)

Nowhere in these comments is the State attempting to define the term "reasonable doubt" for the jury. Rather, the State simply told the jury that it was okay for them to have questions as long as those questions don't amount to a reasonable doubt, leaving it entirely to the jury to determine what "reasonable doubt" itself means. Neither is it a problem that the State identified a specific question the jury might have and still convict defendant because, again, the State expressly left it to the jury to decide both whether that question rose to the level of reasonable doubt and what the term "reasonable doubt" itself means. To be sure, if the State had said only that "[i]t's okay for you to have a question like [what point of access did he take] and to convict the defendant," defendant may have a point because then the State *would* be saying that, by definition, such questions do not rise to the level of "reasonable doubt." But that was not what the State said. In fact, the State said precisely the opposite, adding immediately that a conviction in the face of such questions is permissible only "[a]s long as those questions don't amount to a reasonable doubt." Nothing in these comments attempts to define or dilute the "reasonable doubt" standard, and consequently we reverse that portion of the appellate court's opinion holding that they were improper and may not be repeated on retrial.

¶ 50 *Reasonable Doubt*

¶ 51 The final question we must decide is whether the State proved defendant guilty beyond a reasonable doubt, such that a retrial of defendant is not barred by double jeopardy principles. We hold that the State did.

¶ 52 The applicable law is well established. The double jeopardy clause precludes the State from retrying a defendant once a reviewing court has determined that the evidence introduced at trial was legally insufficient to convict. *People v. Henry*, 204 Ill. 2d 267, 288 (2003). The double jeopardy clause does not preclude retrial when a conviction has been overturned because of an error in the trial proceedings, but retrial is barred if the evidence introduced at the initial trial was insufficient to sustain the conviction. *People v. Lopez*, 229 Ill. 2d 322, 367 (2008). "[F]or purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence." *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). Retrial is the proper remedy if the evidence presented at the initial trial, including any improperly admitted evidence, was sufficient to sustain the conviction. *People v. McKown*, 236 Ill. 2d 278, 311 (2010). In determining the sufficiency of the evidence, this court considers

whether, viewing the evidence in the light most favorable to the State, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 53 "Proof of an offense requires proof of two concepts: first, that a crime occurred, or the *corpus delicti*, and second, that it was committed by the person charged." *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004). In a prosecution for murder, the *corpus delicti* consists of the fact of death and the fact that death was produced by a criminal agency. *Id.* Here, the State's case included Dr. Kalelkar's expert medical opinion that Kathleen's death resulted from manual strangulation. If believed by the jury, this testimony alone is sufficient to permit a rational trier of fact to conclude beyond a reasonable doubt that Kathleen's death was produced by criminal agency. As for whether Kathleen's death was caused by defendant, the State's case included ample circumstantial evidence from which a rational trier of fact could reach that conclusion beyond a reasonable doubt, including evidence showing that the scene at the railroad tracks was staged, that Kathleen died somewhere else shortly before being moved to the tracks, that Kathleen had been dressed by someone else prior to being moved to the tracks, that Kathleen and defendant had been arguing about Keogh in the hours leading up to Kathleen's death, that the last text messages sent on Kathleen's phone were those sent by defendant to Keogh at 4:45 on the morning of Kathleen's death, and that defendant's response to first hearing the news of his wife's death was, "I didn't do anything. I didn't do anything." Based on this and other additional evidence adduced by the State, we have no problem concluding that a rational trier of fact easily could have concluded beyond a reasonable doubt that Kathleen's death was produced by a criminal agency and that defendant is the person responsible. Accordingly, defendant's retrial is not barred by double jeopardy principles.

¶ 54                                                    CONCLUSION

¶ 55 For the reasons set forth above, we reverse those portions of the appellate court's decision holding that (1) the trial court should have excluded Kristine's brief foundational testimony about the closeness of her relationship with Kathleen and (2) the State improperly attempted to define and dilute its burden of proof during its closing argument. The remaining portions of the appellate court's decision are affirmed, and the cause is remanded to the circuit court for a new trial.

¶ 56 Appellate court judgment affirmed in part and reversed in part.

¶ 57 Circuit court judgment reversed.

¶ 58 Cause remanded.