# Illinois Official Reports

## Appellate Court

---

### *People v. Lofton*, 2021 IL App (1st) 181618

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANDRE LOFTON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-18-1618 |
| Filed | October 22, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-890; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Richard Connor Morley, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Mikva and Oden Johnson concurred in the judgment and opinion. |

¶ 1        Following a jury trial, defendant Dandre or D'Andre Lofton was convicted of first degree murder by personally discharging a firearm proximately causing death and of two counts of armed robbery with a firearm and was sentenced to a total of 71 years' imprisonment. On appeal, he contends that he was deprived of a fair trial by the (1) trial court's ruling that defendant's eyewitness identification expert witness could not testify that he relied on empirical studies of actual cases of misidentification to form his opinions, and (2) State's argument in its rebuttal closing argument that the expert witness had no real world experience. For the reasons stated below, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3        On February 23, 2018, a jury found defendant guilty of first degree murder by personal discharge of a firearm and two counts of armed robbery. The court sentenced him on June 20, 2018, to a total of 71 years' imprisonment and denied his postsentencing motion on June 28, 2018. Defendant filed his notice of appeal that day. Thus, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017) governing appeals from a final judgment of conviction in a criminal case.

¶ 4                                    II. BACKGROUND

¶ 5        Defendant was charged in relevant part with first degree murder for killing Darryl Daviston or Davidson on or about April 15, 2012, by personally discharging a firearm proximately causing death and with the armed robbery of Frank Corgwell and James Lee by taking a cell phone and currency respectively while armed with a firearm on the same date.

¶ 6                                        A. Pretrial
¶ 7                            1. Motion to Suppress Identification

¶ 8        Before trial, the defense filed a motion to suppress identification testimony, arguing that Hasan Abdullah's pretrial identifications should be suppressed because they were the result of suggestive procedures. The defense alleged that Abdullah heard gunshots outside his home in the early morning of April 15, 2012, saw a man with a gun robbing two men on his porch, and called the police. Later that morning, police showed him photographs, and he said, "that could be the guy with the gun." About a week later, a detective showed him a photographic array including the same person, which the defense argued was improper. The defense also argued that the other photographs in the latter array were chosen to be similar to defendant rather than to Abdullah's description of the shooter and that two suspects were improperly included in the same array.

¶ 9        At the hearing on the motion, Detective Andrew Burns testified to interviewing Abdullah on the morning of the Davidson shooting and learning that he saw one man rob two other men at gunpoint on his porch. Davidson's girlfriend later told Burns that "D-Money" was involved in the shooting. Burns found that Calvin Choice, defendant's cousin who lived in the neighborhood, was one of the people known by that nickname. Burns created a photographic array including defendant and Choice and showed it to Abdullah on April 22, 2012. Abdullah

chose defendant from the array. On cross-examination, Burns denied that he or another detective showed Abdullah photographs on the morning of the shooting because Burns did not have a suspect at that point.

¶ 10    Abdullah testified that he spoke with police including Burns on the morning of April 15, 2012, describing an armed robbery he had seen on the porch. "[T]he detective" showed him photographs that morning and asked him if he recognized anyone. He recognized "the man in the photograph I believe to be the man that was just on the porch robbing the person that was on the porch." He acknowledged that he used the word "believed" with the detective and said "This one right here more likely looks like the one who was on the porch with the gun." He believed he was shown a photographic array on April 22, though his recollection had to be refreshed by the advisory form he signed that day. When asked if he was shown a particular array, he replied "Those were the photographs they showed me in the beginning" and clarified that he "saw these same photographs on April 15" and "again on April 22."

¶ 11    Abdullah was interviewed by defense counsel in 2014 and acknowledged his signed statement from that interview as "[m]y statement of what I told you about the robbery at that time" including that he initialed the photograph from the April 15 array as "the one who looked like the man with the gun." He said "what I thought or could have been appeared to be—might have been somebody with somebody, there was also somebody at the car, waiting on him at the car."

¶ 12    On cross-examination, Abdullah admitted he could not "remember all the dates regarding this incident and [his] part in it." He had read and signed the statement prepared by the defense based on his account. On redirect examination, when asked if he would change anything in his statement, Abdullah replied "I change the point where it says I think or I thought. The young man was the man that was on the porch. That's what I was trying to explain to you back then."

¶ 13    Following arguments, the court denied the motion to suppress Abdullah's identification testimony. Regarding the claim that he was shown photographs of defendant on April 15, as well as April 22, the court was "not satisfied that Mr. Abdullah's testimony is accurate in that regard" but believed Burns that he did not show Abdullah photographs on April 15. More generally, the court "heard nothing that would indicate to me that the identification of [defendant] by Mr. Abdullah in any manner is at all the result of suggestive police identification procedures."

¶ 14                          2. Dr. Loftus's Opinions

¶ 15    The defense then filed a motion for a continuance to call an eyewitness identification expert witness pursuant to *People v. Lerma*, 2016 IL 118496, disclosing that it intended to call Dr. Geoffrey Loftus as that witness. The court denied the continuance on the basis that the case had been pending since 2013 and it was October 2017 at that point.

¶ 16    Dr. Loftus submitted a report. Following his curriculum vitae and a summary of the facts of this case as they had been relayed to him, he explained that he would testify "about factors relevant to eyewitness perception and eyewitness memory." He would not "issue judgments about whether a particular witness's identification of a suspect is correct or incorrect." Instead, he would "provide information to the jury about the scientific bases of various relevant aspects of perception and memory." He would explain "that, contrary to common sense, a confident witness may not be an accurate witness," as shown both by reversed convictions based on confident but false identifications and by studies. A witness may not form an accurate memory

of an offender's appearance due to factors like stress and lighting conditions and then may unknowingly use post-event information to reconstruct the inaccurate perception into a coherent image that the witness is now confident is accurate. It is therefore possible but not obvious to jurors "that the defendant is not the person who was viewed by the witness, but that the witness nonetheless expresses a strong, honest, confident belief that he was."

> "I wish to emphasize that any testimony on my part which suggests unreliability on the part of an eyewitness who identifies some defendant should not, *ipso facto*, be taken to imply that the defendant is innocent—it implies only that the trier of fact should view the eyewitness evidence with appropriate caution in deciding whether or not to convict the defendant."

¶ 17 Dr. Loftus reported that he was applying concepts and principles generally recognized in psychology and based on "controlled laboratory research *** published in peer-reviewed journals" as well as "observations of real-life incidents that bear on the conclusions that issue from the laboratories" including "cases of eventually exonerated individuals" and "a study, conducted in Illinois, of actual police lineups." The report concluded with an extensive bibliography of the journal articles and books he referenced in preparing the report.

¶ 18 Regarding the theory of perception, Dr. Loftus had three key points:

> "First, initial memories are fragmented, disorganized, and incomplete. Second, memory changes over time in such a way as to become more detailed, more coherent, more organized, and more complete. Third, such memory change may occur in such a way that, unbeknownst to the witness the memory is—critically and nonintuitively—*not* necessarily becoming more accurate; hence the witness ends up with an eventual memory that is strong, detailed, real-seeming, and confidence-inducing, but nonetheless incorrect in important respects." (Emphasis in original.)

Dr. Loftus would describe how memory fails due to "factors operating at the time of the original event that diminish or preclude a witness's ability to accurately memorize the offender's appearance," "events occurring during the *retention interval* that intervenes between the time of the original event and the time that the witness is called upon to recollect something about the event," and "the procedures by which information is elicited from the witness's memory." (Emphasis in original.) He would describe in detail how perception can be negatively impacted by poor lighting, including streetlamps; attention under stressful circumstances, including the presence of a deadly weapon; and duration of the perception. He would also discuss in detail procedures for lineups and photographic displays that could bias identifications. He would discuss how independent witness identifications imply greater reliability but only if the identifications are truly independent and witnesses do not influence each other by sharing post-event information. Similarly, he would discuss how an identification biased by an earlier procedure can influence later identifications.

¶ 19 ### 3. Motions *In Limine*

¶ 20 The State's motions *in limine* sought in relevant part to bar testimony or comments by (1) Dr. Loftus "on the 'reliability' and 'credibility' of the witnesses, which is clearly a function of the jury," (2) the defense and its witnesses "on unrelated cases overturned by courts of review where the defendants have been 'exonerated' because they were 'wrongfully accused, convicted or sentenced,' " or (3) Dr. Loftus "on any double blind and sequential lineup procedures and the reliability of such and an Illinois lineup study and scientific evidence

concerning lineup procedures" or that "a lineup is biased if defendant is the only one in the lineup that is in the photo array."

¶ 21        At the hearings on the motions *in limine*, the defense noted that Dr. Loftus does not testify to the reliability or credibility of trial witnesses but about procedures and circumstances that can affect eyewitness identification. The court agreed that Dr. Loftus does not opine directly on trial witnesses, granting the State's motion on that point but remarking "it's not going to be a problem."

¶ 22        Regarding barring evidence of exonerations, the State argued that allowing Dr. Loftus "to testify as to particular cases or studies" would "open the door for them to testify to other cases where people have been wrongfully convicted." The defense argued that exoneration cases are

> "the whole purpose that eyewitness experts are being allowed in. It's not simply theoretical that they do this in the laboratory. It came out exactly because of the number of cases that have—where there was an eyewitness identification or multiple eyewitness identifications and DNA exonerated people. What he won't testify to is whether that is the case here."

The court granted the State's motion *in limine* on this point, finding that neither:

> "Loftus nor anyone else will be permitted to come in here and testify regarding prior matters or other matters that have absolutely no connection with this case that some people believe may have led to 'exoneration' of other persons. I frankly have to say the word exoneration is one of those words that I don't think a lot of people know what it means. It means to be proved blameless. The fact that people are often convicted of cases and then their convictions are overturned for one reason or another doesn't necessarily mean that they were exonerated, that they were proved blameless. *** If you think I'm going to parse that that's the case in these cases or those cases that Dr. Loftus might talk about, I'm not going to do anything of the sort. He's not going to be permitted to talk about persons who have been 'exonerated,' whatever that may mean to him or to anyone else who may have compended such lists of exonerations that he may rely on."

Dr. Loftus would be allowed to testify "regarding his belief as to how certain factors have the potential to impact generally persons' abilities to identify some other persons" but not to "start cataloging, even generically or generally, that persons were exonerated because of imperfect identifications." The defense requested that, in light of this ruling, the State should be barred from arguing that Dr. Loftus does not study real cases and only does studies in "laboratory conditions" because that would be untrue. The court reserved ruling on that request until Dr. Loftus's testimony.

¶ 23        Regarding Dr. Loftus testifying on biases from certain identification procedures, the State argued that identification procedures were not "an appropriate topic for a defense expert at all," noting that Dr. Loftus is an expert in perception and memory and that expert testimony on the point would confuse the jury. The State also argued that having the same person in more than one procedure has been held to not be suggestive. The defense replied that it had no objection to barring evidence that a lineup is biased if only one person in it was also in an earlier photographic array. However, the biases in identification procedures are within the ambit of an expert on perception and memory, as poor procedures can negatively affect the reliability of memory. The court denied the State's motion to suppress evidence "on any double blind and sequential lineup procedures and the reliability of such and an Illinois lineup study and

scientific evidence concerning lineup procedures" but granted the motion to exclude evidence that "a lineup is biased if defendant is the only one in the lineup that is in the photo array."

¶ 24                                   B. Trial Evidence

¶ 25                                        1. Corgwell

¶ 26     At the February 2018 trial, Corgwell testified that, on the early morning of the day in question, he was on the front porch of a home with Davidson, his cousin, when they were joined by Lee. The home was on Springfield Avenue near 13th Street in Chicago, but Corgwell could not recall the particular address. While it was nighttime, the area was "pretty light" from the porch light, streetlamps, and the lights of a school across the street. Davidson was in front of the porch talking on a cell phone when a black Dodge Charger came around the corner and stopped. A man, who Corgwell identified as defendant, exited the Charger from the passenger door and asked Davidson for marijuana. When Davidson said "no," defendant tried to grab Davidson, who fled southward, and defendant fired a handgun twice. Defendant then came onto the porch and stood "[p]retty close" to Corgwell, pointed the gun at Corgwell and Lee, and demanded their belongings. Corgwell saw defendant's face, which was not obscured by the hood he was wearing. Corgwell gave defendant his cell phone and saw Lee give defendant marijuana and cash. Defendant told Corgwell and Lee to run, then ran back to the Charger. Corgwell ran to his van and drove home, while Lee boarded a bus. Corgwell later returned to the scene and spoke with police when he learned that Davidson was found dead.

¶ 27     On April 22, about a week after the incident, Corgwell viewed an array of six photographs and identified defendant as the gunman. Corgwell had a pending felony case concerning suspension of his driver's license, but he was made no promises regarding that case for his trial testimony. He also had prior convictions for two drug offenses and a weapons offense.

¶ 28     On cross-examination, Corgwell maintained that there was a porch light but could not point to one on a photograph of the porch at 1306 South Springfield Avenue. When shown a photograph of the street in question, he testified that it did not resemble the street on the night of the shooting because the porch was dark in the photograph but "lit up" that night. When he ran from the scene, he did not see Davidson because it began pouring rain. He ran to a liquor store and borrowed a phone to call a friend. Later that night, he told police that Davidson was in front of 1308 rather than 1306 South Springfield Avenue when the offenders drove away. He recalled telling police that the shooter wore a black hooded sweatshirt and jeans but did not recall describing his shoes. He described the shooter as in his twenties, slim, and "brown skinned," with a "light" mustache and beard. He did not see the shooter's hair, and police did not ask him that night to describe the gunman's face.

¶ 29     Corgwell saw Lee a few days after the incident but did not discuss it with him. When he saw the array on April 22, it included a light-skinned man and at least one man with braids, though Corgwell said the shooter was brown-skinned and Corgwell's description did not include braids. He did not recall being interviewed by the defense in April 2015 but recalled being shown a photograph of a man other than defendant and saying that the man "could have been" the shooter.

¶ 30     On redirect examination, Corgwell testified that it was not raining when Davidson was shot, was drizzling when defendant robbed him, and was not raining hard until the Charger left. Lee was not with Corgwell when he viewed the array. The defense later showed him a

single photograph, rather than an array, and asked if it could be the shooter.

¶ 31                                    2. Lee

¶ 32       Lee testified that he was on the porch of the home at 1306 South Springfield Avenue with Corgwell and Davidson at about 1:45 a.m. Davidson asked to borrow Lee's cell phone and stepped off the porch to the sidewalk to make a call. It had just begun to rain when a black Charger turned the nearby corner and pulled up in front of the home next door to the south; that is, 1308 South Springfield Avenue. Davidson walked up to the car and briefly spoke with the passenger, then started to run away. The passenger, wearing a black jogging suit and identified by Lee as defendant, got out of the car with a gun in hand and shot twice at the fleeing Davidson twice, striking him with the second shot. Defendant then came onto the porch and aimed the gun at Corgwell while demanding belongings. Lee gave him money after seeing Corgwell give defendant his cell phone. Defendant ran back to the Charger, which drove away. The driver, a man, had never approached Lee, Corgwell, or Davidson. Lee ran to a bus stop and went home by bus. The day after the incident, an officer showed Lee a photographic array, which did not include defendant, and Lee did not identify anyone. In August 2012, Lee viewed another array and identified defendant as the shooter. In December 2012, Lee viewed a lineup and identified defendant as the shooter.

¶ 33       On cross-examination, Lee testified that he, Corgwell, and Davidson were selling marijuana on the night in question and Davidson had approached the Charger to serve its occupants. While the shooter pointed his gun at Corgwell's head, he pointed it at Lee's kneecap, and Lee paid attention to where it was pointed. Lee noticed the curtains in the home moving so he knew someone was watching. There were lights on the porch and in the hallway inside the home, though Lee acknowledged stating in an earlier interview that the scene was lit by the corner streetlamp and the school across the street.

¶ 34       Lee did not call the police or mention to anyone on the night of the shooting that he saw Davidson being shot. The next day, he gave police a description of the shooter, including his clothing and "everything." He did not know the shooter's height or weight. The shooter had a short "high fade" hairstyle, though Lee did not tell the police that. The shooter did not have a "hoodie" but was wearing a black hat as part of his all-black outfit. The shooter was brown-skinned, and Lee told the police that. However, he also acknowledged telling police that the shooter was 35 with short hair and light skin. He denied telling Detective Dale Potter that defendant fired only one shot but did tell Potter that the shooter held the gun, a black 9-millimeter automatic, in his left hand.

¶ 35       Lee testified that, when he was shown photographic arrays in April and August, there was a person common to both arrays, specifically defendant. However, when shown the arrays he recalled that he had not identified anyone in the April array and acknowledged that a man other than defendant was common to both arrays.


¶ 36                                    3. Abdullah

¶ 37       Abdullah testified that he was sleeping in his first floor home at 1306 South Springfield Avenue when he was awakened by gunshots around 1:30 a.m. and heard a man's voice in front of his home say "give me what you got." Abdullah looked out his front window, moving the curtain aside and peeking without turning on the room lights, and saw a man pointing a gun at two other men on his porch. With the hall light and streetlamps, he could see the gunman's

entire face, and he identified defendant. Another man was standing by a dark car parked in the street. Abdullah did not see defendant leave before closing the curtain. There were several new streetlamps on his block, about one every two buildings, and a school was across the street. Nothing blocked his view that night.

¶ 38    Abdullah called the police twice, once upon hearing the gunshots and again after the robbery. He spoke with the police at the scene that night. On April 22, about a week after the incident, he viewed an array of six photographs and identified defendant as the gunman. In December 2012, Lee viewed a lineup of five men and identified defendant as the gunman.

¶ 39    On cross-examination, Abdullah admitted that there was no streetlamp in front of his home, and a photograph of his home and the home on either side of it showed no streetlamps. There was no porch light on his home or either of his neighbors, though there was light in the window of the home south of his. It was raining, but not hard, during the robbery. Abdullah described the gunman that night as a dark-complected black man about 20 years old but denied saying he was 5 feet, 11 inches, tall and 180 to 190 pounds. The gunman was not wearing a hood over his head. Abdullah admitted telling police in an interview that defendant "definitely most likely" was the gunman. He acknowledged that the defense showed him a photograph of a man other than defendant in 2014 but denied saying it could have been the gunman. Instead, he had said that the man in the photograph was similar to, and could be related to, the gunman. Abdullah admitted that he may have given pretrial testimony that "this guy right here looks more likely like the person that was on the porch and he was definitely the person with the gun." He was not certain of his hearing testimony, as he was "halfway on medication and halfway incoherent" during the hearing.

¶ 40    On redirect examination, Abdullah testified that he signed a statement prepared by the defense but wanted to edit the statement to say that the man he chose in the police array—that is, defendant—was definitely the gunman, not just that he looked like the gunman.

¶ 41                          4. Other State's Evidence

¶ 42    A police officer testified to being one of the first responding officers and finding Davidson at about 1:45 a.m. sitting against a tree at 1321 South Springfield Avenue, slumped forward and unresponsive, with bloodstains on the ground. He did not know if Davidson was alive when an ambulance took him away.

¶ 43    A forensic investigator testified to the collection and photographing of evidence at the scene, including a spent firearm cartridge on the sidewalk by 1308 South Springfield Avenue. There was a "downpour of rain" when he arrived at the scene at about 2:50 a.m. The photographs of the scene were taken with a flash, but there was ambient lighting including streetlamps. There were streetlamps on both sides of the street, albeit none in front of 1306 South Springfield Avenue or the homes on either side of it. He saw no porch light on the home at 1306 South Springfield Avenue, and no photographs were taken inside that home.

¶ 44    The parties stipulated that a medical examiner would testify to performing Davidson's autopsy and concluding that he died of two gunshot wounds to the back.

¶ 45    Burns testified to investigating the Davidson shooting and speaking with Abdullah and Corgwell at the scene. The next day, he spoke with Davidson's girlfriend and prepared a photographic array but did not show it to anyone. He sought to interview Lee, who was found and interviewed by Potter; Burns never interviewed Lee. After speaking with fellow officers,

Burns prepared another array that he showed separately to Corgwell and Abdullah, who identified defendant as the gunman. Burns denied ever showing Abdullah or Corgwell a single photograph rather than an array. After the April 22 arrays, Burns was seeking defendant's arrest.

¶ 46    On cross-examination, Burns testified that Abdullah described the gunman on the night of the shooting as clean-shaven; dark-complected; 5 feet, 11 inches, tall; and 180 to 190 pounds. The first array Burns prepared was shown to Lee by Potter. Burns did not record in writing or on video the exact words Abdullah or Corgwell used in identifying defendant from the second array. On redirect examination, Burns testified that his reports reflected that Abdullah and Corgwell each positively identified defendant.

¶ 47    Potter testified that he interviewed Lee on the day after the shooting in April 2012, showing him an array prepared by Burns that did not include defendant. Lee made no identification. On cross-examination, Potter added that Choice was in the lineup he showed Lee. Detective Eugene Schleder testified that, in August 2012, he showed Lee another array prepared by Burns that did include defendant, from which Lee identified defendant as the shooter. On cross-examination, Schleder testified that the array he showed Lee included Choice as well as defendant. He did not record in writing or on video the exact words Lee used in identifying defendant. The next day, he interviewed Lee again and showed him a single photograph of defendant.

¶ 48    Detective Scott Reiff testified to conducting a December 2012 lineup of five men, including defendant after his arrest. The other men were from police lockups and were chosen in an "attempt to find closely-matched subjects according to race, age, body size, things of that nature." Each participant wore a white cap to account for their different hairstyles. Reiff showed the lineup separately to Abdullah and Lee, and each identified defendant as the gunman.

¶ 49    On cross-examination, when asked if he sought lineup participants who resembled the witness descriptions of the offender, Reiff testified that he did not have the descriptions and, "at that point in the investigation," he was seeking participants who resembled defendant, the subject of the lineup. Reiff acknowledged that the caps did not conceal all participants' hair, as at least one man had visible braids, but he "did the best we can with the hats we had." He did not record in writing or on video the exact words Abdullah or Lee used in identifying defendant. Reiff testified on redirect examination that police were not videotaping the viewing of lineups or photographic arrays in 2012 and, on recross-examination, that police were videotaping interviews in 2012 so they "certainly had the equipment" to do so.

¶ 50    The State rested, and the court denied a defense motion for a directed verdict.

¶ 51                              5. Defense Evidence

¶ 52    Potter testified for the defense that, when he interviewed Lee on the day after the shooting, Lee said that a passenger exited a car and fired a single shot at Davidson and Lee described that person as being 35 years old with light skin and short hair.

¶ 53    Dr. Loftus, an experimental psychologist, testified as an expert on eyewitness identification, perception, and memory. He testified at length to his academic credentials, including teaching and editing journals, and his published research. He contrasted an

experimental psychologist who conducts scientific research with a clinical psychologist who treats patients.

¶ 54　　Dr. Loftus testified that a person first has a conscious experience of an event, or the details the person is able to perceive through his or her senses as the event occurs in his or her presence. An event generates much more information than a witness perceives. Generally, the information sent to memory by conscious experience is an accurate reflection of the event, though there are caveats and exceptions. However, a witness's information about an event also comes from post-event information, which can arise well after the event and may or may not be true. Witnesses "can and do supplement their original memory for the event with post-event information" to prepare a coherent story about the event and that coherent story is a single memory consisting of both a witness's conscious experience and post-event information.

¶ 55　　Dr. Loftus gave the example of a passerby witnessing a car crash at an intersection. The witness would see and hear the event as it occurs, and then the conscious experience ends. A paramedic treating the drivers may then comment within the witness's earshot that one of the drivers is habitually intoxicated. The witness may combine that post-event information with his conscious experience and later recall that the driver was drunk. The witness may further incorporate that information and inferences from it by "re-imagining" that the drunk driver swerved erratically because that is something that drunk drivers often or typically do. The "result is that the witness may wind up with a memory that is very strong, very compelling, seems very real that they express with great confidence" but is based primarily on post-event information of dubious accuracy.

¶ 56　　Turning back to the conscious experience, Dr. Loftus addressed the effects of lighting on perception. It is common knowledge that poor lighting negatively affects perception. Also, humans have two visual systems, one for daytime use and another for use at night or when lighting is dim. The night-vision system does not see color but only shades of gray, and it does not see fine details. A witness may then use post-event information to add color and fine detail to his or her memory. Streetlamps are "severely suboptimal for being able to perceive *** a person's appearance" because streetlamps are dim so as not to overwhelm by being overly bright at night; are widely spaced so that a witness generally does not receive much light from two streetlamps; and if you are close to one streetlamp, it casts light so that "half of what you're looking at is illuminated and the other half is in shadow." The ideal situation is that the streetlamp is directly behind the witness; the worst situation is where the streetlight is directly behind the person to be identified, as his or her face is in shadow; and the typical situation is somewhere in between. Rain also affects visual perception, as wet surfaces reflect light like a mirror.

¶ 57　　Dr. Loftus testified that the ability to pay attention or to focus is also important to conscious experience and has two components. The first is that, at any given waking moment, "a person is trying to accomplish some goal," from as simple as holding an object in his or her hand to brain surgery. The second is that, also at any given waking moment, a person is "bombarded by an enormous amount of information coming into their brain by their sense organs." Thus, a person is always receiving more information than he or she needs to accomplish the present goal and must filter out "the large proportion of incoming information" as irrelevant to the goal. This is relevant to perception and memory because aspects of an event that a witness is not paying attention to or focusing upon will not be remembered later. "[T]housands of experiments" have shown the effects of attention on memory, and Dr. Loftus discussed in detail

one of these experiments. The conclusion of that experiment was that there are two circumstances where a witness would not pay attention to something that may later be important: because it was not relevant to the witness's goal at the time or because "there are many things in the events that are all relevant" to the witness's goal so that the witness had to choose where or upon what to focus. Dr. Loftus explained that other experiments have addressed the latter circumstance where a witness must choose where to focus among multiple relevant aspects. For instance, when a person is told to look at a complex scene and told that one aspect of it is important, he or she will have a memory only of the aspect he or she was told was important.

¶ 58    Dr. Loftus testified that many studies have been made of weapons focus, where out of fear of being injured by the weapon in a scene a person focuses on the weapon to the exclusion of all other aspects of the scene, including the appearance of the person with the weapon. This is an extreme example of the general tendency to pay attention to objects or elements that are unusual or unexpected. Dr. Loftus described experiments where half the participants saw a person holding a checkbook and half saw a person holding a knife, and the latter more likely to look at the knife and less at the person holding it, and less able to remember the appearance of the person with the knife, than the group who saw the person with the checkbook.

¶ 59    Dr. Loftus explained that stress affects mental function generally, and high stress particularly so. He described studies of military personnel whose mental functions "however defined" deteriorated when being fired upon with live ammunition compared to simulated ammunition. The studies concluded that a moderate stress level results in optimal mental functioning, as high stress impairs but low stress also does not result in high mental functioning. Turning to memory, Dr. Loftus testified that high stress events can result in very vivid and detailed memories that seem particularly accurate but may not be. A person who experienced such an event may, in reliving the event mentally, add post-event information to construct a better narrative of the event. Dr. Loftus gave the example of a particular actual airplane crash, fatal to all aboard, witnessed by people on the ground who shortly afterwards vividly described things they could not have seen due to the speed of the airplane, such as the passengers clawing at the airplane windows.

¶ 60    Dr. Loftus testified regarding the effect of time on conscious experience that it is common knowledge that a witness has a better opportunity to transfer probably reliable conscious experience into memory the longer the witness has to perceive the event. Dr. Loftus added that the functional duration of an event—"that part of the total duration during which the witness has the capability of perceiving and memorizing what the offender looked like"—may be significantly shorter than the event as a whole because (1) the offender has to be within the witness's field of vision, (2) the lighting has to be adequate to perceive the offender's features, (3) the witness's stress level has to be not so excessive as to "preclude their being able to perceive and memorize details," and (4) the witness must be paying attention to the offender's appearance. Dr. Loftus described how the effects of duration have been derived from experiment. A witness who has not had a significant functional duration may nonetheless identify someone as the offender.

¶ 61    Dr. Loftus explained that a person with virtually no memory of an offender's appearance could nevertheless make an identification due to biases in the identification procedure. Such biases do not necessarily mean that the resulting identification is wrong or the identified suspect is innocent. (On the State's objection to discussion of what could cause biases in an

- 11 -

identification procedure, the court held that Dr. Loftus could testify to why sequential lineups are better than simultaneous lineups but could not testify to the Illinois lineup study or "some statistical thing that it is more likely to be identification.") A procedure would be unbiased if the chances of the witness misidentifying the suspect as the offender were no greater than the chances of so misidentifying the other people or "fillers" in the lineup or photographic array.

¶ 62 Dr. Loftus testified that a double-blind lineup or array would involve the police officer conducting a lineup not knowing who the suspect is so that they cannot subtly or even unconsciously convey that knowledge to the witness. When asked if he had experienced this himself, Dr. Loftus described a case in California where two witnesses were filmed as each viewed a photographic array. When one witness seemed to be focusing on one of the fillers, the officer asked if there was anyone else who looked familiar, and the witness selected the suspect. By contrast, when the other witness focused on the suspect, the officer asked the witness to initial the photograph he selected. The officer was not necessarily providing this sort of feedback intentionally, but it nevertheless affected the identification. The witness became more confident that he or she chose the right person in the lineup, and the witness changed his or her memory "in such a way that they become more conducive to be able to have memorized the offender's appearance." In other words, if the witness believes he or she made the right selection, he or she will remember the lighting and duration as more favorable for viewing than they actually were.

¶ 63 Dr. Loftus opined that it is important to select the fillers in a lineup or array to fit the witness's original description of the offender. For instance, if the witness described the offender as having a gapped tooth, the fillers should also have gapped teeth. Otherwise, the witness would easily eliminate the fillers that do not have the offender's characteristic such as gapped teeth.

¶ 64 Dr. Loftus then compared simultaneous and sequential lineups and arrays. In the former, the fillers are shown or stand with the suspect so the witness sees them all at once, while in the latter each filler and the suspect are shown or stand one at a time so the witness sees each alone. Experiments have shown that sequential lineups or arrays reduce the chances of misidentification because a witness viewing simultaneously can compare the participants and choose which most closely resembles the offender "even if the match isn't very strong."

¶ 65 Dr. Loftus testified that post-event information can affect lineups and arrays. A witness who viewed an array and identified someone "is in a position to use the appearance of the person they have just identified as post event information" so that a "hazy initial recollection of the actual offender" can become a stronger memory of the suspect as the offender. Such a witness generally cannot distinguish between his or her conscious experience and post-event information, Dr. Loftus explained. More generally, he opined that confidence is not indicative of the accuracy of an identification because a confident identification could be the result of a robust conscious experience that was generally reliable or the result of post-event information and generally unreliable. The latter is not a lie or conscious untruth.

¶ 66 On cross-examination, Dr. Loftus admitted that he could not say that Corgwell, Lee, or Abdullah "got it wrong" and he did not know how good their memories were or what their stress levels were at the time of the incident. However, as human beings they "are constrained by the physiology of the human sensory systems," which he addressed. For instance, while Abdullah was not on the porch, "[t]here would likely be problems with weapon focus" nonetheless. While lineups and arrays should be based on the witness descriptions, a "witness

can make an identification without being accurate on a height and weight of an individual." A positive identification is more likely if the offender was not wearing a mask and was standing "real close to the witness," though profound darkness or lack of attention would affect the identification of even a very close offender.

¶ 67    Dr. Loftus reviewed the police reports, witness statements, photographs, and other evidence in this case in preparing his report but did not speak directly with the witnesses. Dr. Loftus agreed that it was important for him to know the details or circumstances of the crime, including when and where it happened. When Dr. Loftus was asked where it happened, the defense objected that the State "getting into the facts of the case" was contrary to the State's own motion *in limine*. The court overruled, and Dr. Loftus refreshed his recollection with his report before answering that the crime occurred on the porch of an abandoned house at 1321 South Springfield Avenue. He viewed photographs of the scene but did not visit the scene, and he could not recall seeing any streetlamps nor did he know the distance between streetlamps, though that "would certainly be something that the jury should take into account." He did not recall a school "with the big light on" across the street from the scene, and he did not know if other homes on the street had lights on at the time of the incident. He did not know if it was raining during the incident, "but if it was, then what I said applies."

¶ 68    The State asked Dr. Loftus "These experiments that you talked about, that you gained your knowledge from, that you're testifying to, these are all controlled circumstances, correct?" He replied that "most of the conclusions we come up with come from laboratory experiments under controlled circumstances," but "the main conclusions that we come out with that are relevant to these kinds of cases have been confirmed in real life situations, real crimes and in which witnesses in real crimes have been shown unarguably to have provided false memories that significantly influenced the outcome of real trials." Dr. Loftus's opinions were derived from experiments but "confirmed in real crimes with real witnesses outside the laboratory." The State asked "Your opinion is primarily based on simulations, research experiments *** [that] would be in a college classroom, correct?" Dr. Loftus replied that there were three kinds of relevant data: from controlled experiments, staged crimes in classrooms, and real crimes "in which actual witnesses' memories although confident have been shown to be nevertheless false." The State asked where he gets the information to study actual crimes, and he replied that he reads about them and then analyzes the information. Dr. Loftus reiterated that his conclusions from real crimes "are confirmed in [his] experiments." The participants in Dr. Loftus's experiments are typically college students, and the State asked if they are "truly vested in it or not"; that is, were they paid, working for academic credits, or volunteering. Dr. Loftus replied that he had participants of all three kinds. The State asked if "you don't even know what [the participants were] thinking," and Dr. Loftus replied that he does. When asked if the experiments "are not even like real crimes" Dr. Loftus replied that they typically are not, "except for the staged experiments that you alluded to and the real life experiments that I alluded to." Dr. Loftus's plane crash example was drawn from media coverage of the crash and used to illustrate the effect of post-event information with a high-stress event.

¶ 69    Dr. Loftus opined that a single photograph would not be a lineup or array and would be "extremely unreliable." He had testified in about 400 criminal trials for the defense, while he was considered as a prosecution expert only five times and testified as a prosecution witness only once.

¶ 70    On redirect examination, Dr. Loftus reiterated that rain on the pavement would cause mirror-like reflections and having a weapon pointed at your face would be a high-stress situation. The State had asked "whether [his] research focuses only on controlled experiments" but Dr. Loftus also did "lots of research as you said in real crimes; is that not correct?" He replied that he "paid attention to a lot of crimes where factors in human perception and memory appear to be relevant." When counsel asked "with exonerations for example?" and whether there were "plenty of examples in real life; were there not?" the State's objections were sustained. Dr. Loftus testified that the principles he discussed would "apply not only in this case for this jury but *** in any case where identification—the same event to memory would apply" and are supported by science. Dr. Loftus does not reach an ultimate conclusion of fact in his cases but leaves that for the jury. He gives jurors "tools to decide what weight to give identifications."

¶ 71                              C. Arguments and Verdicts

¶ 72    In closing argument, the State argued that the evidence was sufficient to convict defendant, including that the separate identifications by Corgwell, Lee, and Abdullah were reliable under the factors used to evaluate identification testimony. See *Neil v. Biggers*, 409 U.S. 188 (1972).

¶ 73    The defense argued from discrepancies in the eyewitness testimony and from concepts in Dr. Loftus's testimony that the eyewitness identifications were too unreliable to convict defendant.

¶ 74    In rebuttal, the State argued that Corgwell, Abdullah, and Lee were not all wrong in their separate identifications merely because there were minor discrepancies in their descriptions that did not impact the ability of Corgwell and Lee to pay attention to the arriving car and its passenger, see his face, and recognize him later, nor of Abdullah to pay attention when the gunman was not threatening him. The State also challenged Dr. Loftus's testimony, arguing that lighting, stress, and rain are significant but not decisive, the ability to identify is more important than the ability to accurately describe, and different detectives prepared and showed photographic arrays so that there was something akin to double-blind identification. The State argued that Dr. Loftus

> "conducts experiments. That creates particular—an environment and then studies what happens to it. This is real life. This is a life. You can't recreate this in any laboratory in any classroom at all. No way. And the scientific experiments, he says that it's corroborated from real life crime. What is he reading things."

While a victim or eyewitness is vested in making an accurate identification,

> "These people in these experiments that he relies on for his opinions that he's creating or reading the person on a campus and a person holding a checkbook and it's night. They're not vested in this. But they're some kind of experiment. Some college kid getting credit, not getting credit, volunteering, not vested. You're vested if you're a crime victim *** [or] you see somebody shoot at your friend."

The defense made, and the court overruled, two objections during the State's rebuttal argument: when the State argued that Dr. Loftus did not describe the crime scene accurately, the objection being in light of "the State's motion," and when the State argued that police detectives do not have a vested interest in a witness making an identification. However, the defense did not object to either of the above-quoted passages of the rebuttal argument.

- 14 -

¶ 75    The jury was instructed and deliberated. During deliberations, the jury sent a note asking the court what would happen if the jurors could not reach a unanimous decision and later told the court that "[w]e do not believe we will be able to reach a unanimous decision." Both times, the court told the jury to continue deliberating. Following deliberations, the jury found defendant guilty of first degree murder, including that he personally discharged a firearm proximately causing death, and of the armed robberies with a firearm of Corgwell and Lee.

¶ 76                                    D. Posttrial

¶ 77    In its posttrial motion as amended, the defense argued in relevant part that defendant was deprived of a fair trial when the (1) court ruled that Dr. Loftus could not testify about empirical studies or instances of wrongful convictions arising from misidentification, nor about the unreliability of eyewitness identifications, but could testify only about controlled experiments and (2) State then argued during closing arguments, over defense objection, that Dr. Loftus relied on controlled studies or experiments only. Following arguments at the motion hearing, the court denied the posttrial motion without particular comment beyond that its rulings were correct.

¶ 78    Following a sentencing hearing, the court sentenced defendant to 50 years' imprisonment for first degree murder, to be served consecutively to concurrent 21-year terms for armed robbery.

¶ 79                                  III. ANALYSIS

¶ 80    On appeal, defendant contends that he was deprived of a fair trial when (1) the trial court ruled that Dr. Loftus could not testify that he relied on real cases of misidentification to form his opinion and (2) the State then argued in closing arguments that Dr. Loftus had no real world experience.

¶ 81                                   A. Forfeiture

¶ 82    As a threshold matter, the State argues that defendant forfeited arguments that (1) evidence of specific cases of misidentification is admissible, as his brief cites no cases to that effect, and (2) the State made improper arguments, as he did not object to the particular remarks at issue nor challenge them in his posttrial motion. Defendant responds that he has not forfeited the former because his argument on appeal is not that evidence of specific instances of misidentification should have been admitted but that Dr. Loftus should have been allowed to testify that his opinions were based in part on studying such instances rather than wholly on experimental psychology. Defendant argues that he has not forfeited the latter because counsel objected during the State's rebuttal argument and challenged the State's argument in the posttrial motion.

¶ 83    The record shows that the defense raised its claim about the State's argument in the posttrial motion but does not bear out that the defense objected to the State's arguments when they were made. Neither the objection to the argument that Dr. Loftus misdescribed the crime scene here nor to the argument that *detectives* have no vested interest in a witness making an identification relates to the State's argument that Dr. Loftus had no real world experience but relied solely on experiments where the participants did not face real world circumstances or have the vested interest of a victim or eyewitness. The defense did not object to those remarks. We would

therefore find this claim regarding the State's rebuttal arguments forfeited if it was an entirely separate contention that did not affect any other contention.

¶ 84  However, there was no forfeiture of the claim that the court erred in limiting Dr. Loftus's testimony, and we find defendant's contentions of error to be inextricably linked. The alleged error in limiting Dr. Loftus's testimony regarding studies of past exonerations was at least partially that barring such testimony opened the door for the State to make the argument now at issue. The defense brought that prospect to the court's attention just after the court granted the State's motion *in limine* to bar Dr. Loftus from testifying regarding exonerations and then argued in the posttrial motion that the State used Dr. Loftus's limited testimony to argue that his opinions were not based on real world experience. In other words, the linkage of these claims was brought to the court's attention before and after trial. We will therefore consider defendant's contentions of error on their merits.

¶ 85                                B. Applicable Law

¶ 86  Generally, expert testimony will be permitted if the witness's experience and qualifications afford him or her knowledge not common to lay persons and the proposed testimony will aid the trier of fact in reaching its conclusions. *People v. King*, 2020 IL 123926, ¶ 35. The trial court should balance the probative value of the proposed evidence against its prejudicial effect and should carefully consider its necessity and relevance in light of the particular facts of the case. *Id.* Since our supreme court decided *Lerma*, research concerning eyewitness identifications "is well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." *Lerma*, 2016 IL 118496, ¶ 24. Appropriate cases include where the State's case rests entirely or predominantly on eyewitness identification testimony and many of the factors identified as potentially contributing to the unreliability of such testimony are present, such as the stress of the crime or incident, the presence or use of a weapon, nighttime viewing, and exposure to post-event information. *Id.* ¶ 26. The conclusions of such research are both widely accepted by scientists and often unknown or even counterintuitive to laypersons. *Id.* ¶ 24. Illinois courts "not only have seen that eyewitness identifications are not always as reliable as they appear, but we also have learned, from a scientific standpoint, why this is often the case." *Id.*

¶ 87  The Illinois Rules of Evidence regarding expert witnesses provide that:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Ill. R. Evid. 703 (eff. Jan. 1, 2011).

Also, an "expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Ill. R. Evid. 705 (eff. Jan. 1, 2011).

¶ 88  When the underlying facts or data upon which an expert witness reasonably relied are admitted into evidence, they are not admitted for their truth but for the limited purpose of explaining or exploring the basis for the witness's opinion. *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 31 (citing *City of Chicago v. Anthony*, 136 Ill. 2d 169, 185 (1990)); *People v. Houser*, 305 Ill. App. 3d 384, 394-95 (1999) (citing *Anthony*, 136 Ill. 2d at 185). A

court need not allow an expert witness to testify to the basis of his or her opinion if the court finds that the probative value of the basis for the opinion is outweighed by its prejudicial impact or tendency to create confusion. *Houser*, 305 Ill. App. 3d at 394 (citing *Anthony*, 136 Ill. 2d at 185).

¶ 89 The trial court has discretion on whether to admit expert witness testimony, and we review its decision for an abuse of discretion. *King*, 2020 IL 123926, ¶ 35. Abuse of discretion occurs only when the decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *Id.* Even an abuse of discretion is not reversible error if it was harmless beyond a reasonable doubt. *Id.* ¶ 40. There are three approaches to determining whether an error is harmless: whether the error contributed to the conviction, the other evidence overwhelmingly supported the conviction, or the excluded evidence would have been duplicative or cumulative. *Id.*

¶ 90 Prosecutors are afforded wide latitude in closing arguments and may comment on the credibility of the defendant, witnesses, and the defense theory of the case, as well as respond to comments by defense counsel that invite a response. *People v. Jackson*, 2020 IL 124112, ¶ 82; *People v. Pope*, 2020 IL App (4th) 180773, ¶ 80; *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 57. However, a prosecutor may not comment during argument on evidence that the court excluded. *People v. Mullen*, 141 Ill. 2d 394, 404 (1990). Generally, comments on evidence during closing arguments are proper if they were supported by trial evidence or a fair and reasonable inference from trial evidence. *Jackson*, 2020 IL 124112, ¶ 82. Closing arguments are properly judged in their entirety with challenged remarks viewed in context. *Id.* The standard of review for a prosecutor's closing argument is similar to the test for plain error, which finds an error to be reversible when the trial evidence was so closely balanced that the error alone tipped the scales of justice, and we find reversible error from improper arguments if they denied real justice or the verdict resulted from the improper arguments. *Id.* ¶¶ 81, 83.

¶ 91 Double jeopardy does not preclude retrial when a conviction is overturned because of an error in the trial proceedings unless the trial evidence was insufficient to sustain the conviction. *King*, 2020 IL 123926, ¶ 52.

¶ 92                                   C. This Case

¶ 93 Here, unlike *Lerma*, the trial court admitted expert testimony on eyewitness identifications from Dr. Loftus, and he testified at length to various factors that could affect the weight of identification testimony. Dr. Loftus disclosed before trial that he based his opinions on experiments and on studies of actual cases. While the court barred Dr. Loftus from testifying regarding exonerations, he did testify at trial that his opinions were derived from both experiments and studies of actual cases. We are reluctant to find that the court abused its considerable discretion in balancing the defense's interest in fully explaining the basis for Dr. Loftus's opinions against the State's interest in not having the prejudicial factor of exonerations in other cases put before the jury deciding this case on its merits. Despite the court barring Dr. Loftus from mentioning exonerations, Dr. Loftus placed before the jury the key point that his opinions were derived from experiments but "confirmed in real crimes with real witnesses outside the laboratory." In sum, we find that the court did not bar the defense from sufficiently explaining the basis of Dr. Loftus's opinions so that the jury could evaluate or weigh his opinions appropriately. We find no abuse of discretion by the trial court in its evidentiary rulings.

¶ 94    We turn to the State's closing arguments. The State contends that its rebuttal arguments at issue—that Dr. Loftus based his opinions on experiment but experiments cannot replicate real life and that participants in experiments do not have the vested interest in correctly identifying an offender that a victim or eyewitness has—were properly based on the evidence and reasonable inferences therefrom. The State argues that Dr. Loftus testified to studying real cases that he read about, which it contends were not Dr. Loftus's direct real world experiences. However, the State's argument that experiments cannot replicate real life was unsupported by trial evidence when Dr. Loftus's firm testimony was that his experiments and studies of actual cases supported the same conclusions. Even more disingenuous was the argument about the vested interest of victims and eyewitnesses compared to experiment participants. Dr. Loftus testified that his experiments were corroborated by studies of reversed convictions; that is, instances of actual victims and eyewitnesses who made erroneous identifications despite having the vested interest described by the State in its argument. Dr. Loftus's testimony belied both arguments, but the State made its misleading arguments in rebuttal, which deprived the defense of the opportunity to remind the jury of Dr. Loftus's actual testimony.

¶ 95    However, we find that the State's improper arguments did not constitute reversible error. While there were circumstances such as the incident occurring at night and discrepancies in the eyewitness testimony, the evidence was certainly sufficient to convict. Corgwell and Lee identified defendant as the man who shot Davidson and robbed them at gunpoint, and Abdullah—who did not see Davidson being shot and did not have a gun pointed at him—separately identified defendant as the robber. Especially in light of the different circumstances under which Abdullah viewed and identified defendant compared to Corgwell and Lee, we find the trial evidence was not closely balanced. While Dr. Loftus's opinions regarding perception, memory, and identification were challenged in detail by the State, in ways both proper and improper, the jury duly learned that the basis for his opinions included both experiments and studies of real life cases. The jury having heard the actual evidence regarding the basis for Dr. Loftus's opinions, we cannot conclude that its verdicts resulted from the State's misleading arguments discounting Dr. Loftus's opinions.

¶ 96                              IV. CONCLUSION

¶ 97    Accordingly, the judgment of the circuit court is affirmed.

¶ 98    Affirmed.